Helen C. CARRAS and Bill G. Carras,
Co-Executors of the Estate of Gus N.
Carras, Deceased, Appellants,

v.

James S. BURNS, Jr., et al., Appellees.

No. 74–1224.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 3, 1974.

Decided May 6, 1975.

W. Faison Barnes, Charlotte, N. C. (Anne King and Barnes, Junker & King, Charlotte, N. C., on brief), for appellants.

A. Ward McKeithen, Charlotte, N. C. (William T. Graves, Fleming, Robinson & Bradshaw, Charlotte, N. C., on brief), for appellees.

Before BOREMAN, Senior Circuit Judge, BUTZNER, Circuit Judge, and THOMSEN, Senior District Judge.

BUTZNER, Circuit Judge:

Bill and Helen Carras, executors of their father's estate, appeal from a judgment in their favor for $56,000 in a suit they brought against Merrill Lynch, Pierce, Fenner & Smith and two of its employees to recover compensatory and punitive damages for losses to a margined securities account. Their claim has five elements: (1) violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5; (2) churning; (3) pendant charges of fraud and breach of fiduciary duty under state law; (4) violations of margin maintenance and "know your customer" rules of the New York and American Stock Exchanges and Merrill Lynch's house rules; and (5) usury. The district court denied a mo-

tion to amend the usury claim, dismissed the claim based on state law and margin maintenance rules, and submitted the other issues to the jury on a special verdict. The jury, however, returned what the district court considered to be a general verdict awarding the executors $56,000, on which the court entered judgment.

Neither the brokerage firm nor its employees appealed, but the executors have assigned numerous errors to the court's charge and the interrogatories of the special verdict. We find many of these assignments to be without merit; nevertheless, the few errors that did occur will require a new trial. In accordance with the recommendation of the district judge, who perceived some of the problems as he attempted to reconcile the jury's verdict, retrial should be on all the submissible issues.

I

Gus Carras died on August 4, 1969, leaving half of his estate to his wife and dividing the remainder equally among his six children. The estate's principal asset was a margin account with Merrill Lynch. Mr. Carras had been an active investor who preferred to take substantial positions in a small number of growth stocks and hold them for long term gain. He minimized the use of his own capital by leveraging[1] heavily and always meeting margin calls by sales. Reflecting this policy, the account held positions at his death in eight securities, half of which were in electronics and computer companies. It owed Merrill Lynch $553,362, borrowed under the firm's standard margin agreement. Since the market value of its holdings was $1,083,282, the account showed a net equity of $529,920.

Bill and Helen Carras, two of the children, were appointed executors with complete discretionary power to manage the assets of the estate, including the power to "invest and reinvest in stocks . . . as [they] shall deem advisable, though such investments are not of the character approved by statutory law for the investment of such funds and without the duty to diversify investments." They were also authorized to employ attorneys and agents. Bill Carras, whose experience had been chiefly in the restaurant and real estate businesses, had kept a margin account with Merrill Lynch in his own name for ten years. Although he claimed that his father controlled the account, he followed stock prices in general and the state of his own account in particular. After his father's death, Bill continued trading, sometimes buying stocks that were later bought by the estate. Helen Carras also held a margin account, but her father had controlled it. Her knowledge of the stock market was very limited, and she never bought or sold shares on her own.

Two weeks after their father's death, the Carras children met with James S. Burns, the Merrill Lynch account executive who had dealt with Gus Carras since 1956. The meeting proved in retrospect to be the most important event of the case, and what took place is sharply disputed. The executors maintain that Burns told them that a lawyer was unnecessary; that a fee which a lawyer had quoted to them was excessive; that if they needed legal assistance they could call on Merrill Lynch's attorneys in New York; that he had talked with the assistant clerk of court before the meeting and she had outlined for him the steps they must follow to administer the estate; that he showed them a paper listing the account and the various steps necessary to administer the estate; that he himself had settled his father's estate with a certified public accountant's as-

---

1. "Leverage" is simply the effect of the use of borrowed money on the investor's return on his own capital. Since the lender shares neither the profits nor the losses with the investor, any changes in value have a disproportionate effect on the equity. By way of illustration, the market value of the Carras portfolio declined from $1,083,282 in August 1969 to $767,674 in April 1970, a loss of approximately 25 percent. Since the debt to Merrill Lynch remained more or less constant, net equity fell from $529,920 to $195,079, approximately a 60 percent loss.

sistance; that he had already talked to the accountant about the Carras estate and had made an appointment with him for the executors to discuss the tax aspects of the estate; that he would advise the executors about the stock account; and that he hoped they would place the same confidence in him as their father had.

Burns denied the statements attributed to him by the executors. He testified that Helen Carras initiated the meeting; that he told the children their father had accumulated the stocks in his account by exercising his independent judgment without relying on any broker's advice; that he advised them to get an attorney and an accountant; that the list of steps he had outlined was for transferring the account from the decedent to the executors, not for administering the estate; that the executors decided to maintain the margin account without a recommendation from him; and that several times after the meeting he urged them to reduce the margin debt.

In any event, the family decided to keep the account and not to hire a lawyer. The executors submitted proof of their qualification to Merrill Lynch, the account was transferred to their names, and trading was resumed. Bill, who regularly conferred with Burns, approved all transactions. The executors received confirmation slips for every trade and monthly statements of the account. They consulted one another and other members of the family before making major decisions, but most transactions were handled by Bill and Burns. The executors claim Burns recommended speculative stocks. Burns, though, denied making any recommendations and testified that Bill selected the stocks, often against his advice.

Between August 1969 and April 1970, the account was nearly inactive, but it declined with the general market, its net asset value dropping below $200,000. On April 21, 1970, the estate sold its largest holding, 10,600 shares of Magnavox which had declined more than 25 percent since September. None of the proceeds were applied to the margin debt of approximately $572,000. Instead, the estate bought 10,500 shares of American Broadcasting and smaller holdings in two electronics companies.

By late April, the continuing decline of the market reduced the account's margin below the 30 percent equity required by Merrill Lynch and the 25 percent required by the New York Stock Exchange. Merrill Lynch, however, did not issue a maintenance call until May 5, when it requested $65,000. As the market continued to decline, further calls were made on May 11, 20, and 26 for an additional $40,000. Since the estate had neither cash nor unpledged stock, the calls were met by selling from the account. Most of the account was liquidated, and the excess proceeds from the sales were invested in utility stocks, leaving the account with a net asset value of $70,000. All of the trading in May, aggregating 54 transactions, was to meet margin calls or purchase utility shares.

Trading in the account changed drastically in June and early July. The utility stocks were replaced by more volatile, speculative shares which were sometimes held only two or three days. In the middle of June, William A. Hart, supervisor of the Charlotte office, wrote the executors, observing that they might be overtrading and suggesting that a less active and more cautious approach to the market might ultimately be in their best interest. During June and the only two days the account was traded in July, there were 108 transactions, many involving in and out trades of the same stocks. The turnover of the account from May 29 to June 26, based on total investment, was 1.13 and on net equity, 3.96.[2] From June 26 to July 8, it was 1.37 based on total investment and 5.02

---

2. "Turnover" is a measure of the volume of trading that changes the holdings of a portfolio without changing its size. It is the ratio of the cost of purchases made for the account to the value of either the entire account or the net equity. The executors' expert witness calculated turnover by dividing the value of the account as of the monthly statement date into

based on net equity. In June alone, the commissions and service charges for Merrill Lynch were in excess of $9,000, approximately one-third of the fees earned during the fourteen-month life of the estate account.

Trading abated in the latter part of July, and the account was closed in October 1970 with a net credit balance of approximately $14,000. During the fourteen months following Mr. Carras' death, there were 194 trades involving 104,443 shares having a volume of $2,888,480.03 and generating brokerage commissions and service charges of $27,183.57. The estate claimed a net loss of $547,214.22.

## II

The district court submitted to the jury the question of the brokers' liability for employing fraudulent devices, misrepresentations, and concealment, in violation of § 10(b) and Rule 10b–5. The jury found that Burns had engaged in these unlawful practices, but the court conditioned liability on proof of the brokers' intention to defraud or damage the estate and on the executors' reliance on the brokers' conduct. The jury found no fraudulent intent and, following the court's instructions, it did not reach the issue of reliance.

■ Although there has been much discussion of the mental state required for liability, the courts agree that § 10(b)[3] and Rule 10b–5[4] have eliminated the need to prove common law intent to defraud. It is sufficient if the defendant "knew the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it to be misleading." Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290 (2d Cir. 1969); accord, Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970); cf. S. E. C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). See generally Bromberg, Securities Law— Fraud § 8.4(540). Burns, an experienced broker, knew the dangers of margin trading. Also, Merrill Lynch classified some of the stocks the executors bought as speculative. Whether Burns' conduct is actionable depends on the nature of his relationship with the executors. See White v. Abrams, 495 F.2d 724, 732–34 (9th Cir. 1974).

■ If the executors' testimony is believed, Burns assumed a responsibility greater than that arising out of the ordinary broker-customer relationship. If, as the executors contend, he represented

the amount of purchases made in that month. By measuring purchases instead of sales, he excluded the effect of trades made to meet margin calls or withdraw cash. When, as in this case, no outside funds are provided for new purchases, turnover measures the volume of trading for reinvestment. In order to have a turnover of 1.0, for example, purchases made with funds obtained from sales would equal the value of the portfolio on the statement date.

3. § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.    .    .    .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations

as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

4. S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1974), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

that he could advise them about the administration of the estate without a lawyer, he assumed the duty to furnish information that would enable them to act "with such care, foresight and diligence as an ordinarily sensible and prudent man would act with his own property under like circumstances." Poindexter v. First National Bank of Winston-Salem, 244 N.C. 191, 194, 92 S.E.2d 773, 775 (1956). He could neither misrepresent nor fail to disclose the known hazards of the margin account and the stock he recommended. Further, regardless of churning, he could not propose retention of the margin account, or use it, to enhance his earnings in derogation of the estate's interests. On the contrary, to avoid misleading the executors he would be obliged to suggest alternative investments in the estate's interest, regardless of the effect on brokerage commissions. If the executors' testimony is believed, there is no need for them to also prove that Burns had the specific intent to defraud or damage the estate. Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290 (2d Cir. 1969).

■ On the other hand, if Burns' testimony is accepted, he acted only as a broker. As such, he would be an agent for each separate trade without any interest beyond his commission. He would be obliged to execute his customers' orders faithfully, but not to volunteer advice. Richardson v. Shaw, 209 U.S. 365, 374–77, 28 S.Ct. 512, 52 L.Ed. 835 (1908); Robinson v. Merrill Lynch, Pierce, Fenner & Smith, 337 F.Supp. 107, 110–113 (N.D.Ala.1971), aff'd, 453 F.2d 417 (5th Cir. 1972); Walston & Co. v. Miller, 100 Ariz. 48, 410 P.2d 658, 661 (1966). If he did offer advice, he would be required by Rule 10b–5 not to mislead by knowing falsehoods or concealment of material facts. *Cf.* Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Hanly v. S. E. C., 415 F.2d 589 (2d Cir. 1969).

■■ The executors also assign error to the questions in the special verdict that required the jury to find that the executors reasonably relied on Burns'

conduct and that his conduct directly and proximately caused damages to the estate. The stringent requirements of the special verdict and its accompanying instructions unduly restricted the executors' right to recovery. When a broker misrepresents a material fact, or in the circumstances shown by the plaintiffs' evidence in this case, fails to disclose information that a reasonable investor would consider significant, it may be inferred that the customer would have relied on the broker's statement or, in the case of non-disclosure, that he would have relied on the information had he known it. Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *Affiliated Ute* also teaches that causation can be established by proof of the misrepresentation or non-disclosure. 406 U.S. at 154, 92 S.Ct. 1456. The broker, however, may rebut these inferences by proving lack of reliance and, consequently, a lack of causation. Rochez Brothers v. Rhoades, 491 F.2d 402, 410 (3rd Cir. 1974).

### III

Another element of the executors' claim is the charge that Burns unlawfully churned the account during April, May, June, and July 1970. The district court submitted this issue to the jury, whose special verdict, however, did not clearly distinguish it from the other issues under submission. The court then granted summary judgment on the churning issue. The executors contend that the district court erred in framing the questions of the special verdict, in defining the measure of damages, and in ultimately granting summary judgment after the jury returned the special verdict.

In submitting the churning issue and phrasing the special verdict, the district court instructed the jury that they should first determine whether the executors "lacked the intelligence, knowledge and experience necessary to enable them to manage the stock account . . . ." Only if they answered this question affirmatively were they to determine

whether the executors gave Burns complete control over the account and whether they relied exclusively on him to manage it. Next, they were to decide whether Burns used his control for the "chief purpose" of his own or Merrill Lynch's profit. Finally, the special verdict authorized damages for churning only if Burns' superiors failed to properly supervise him concerning churning. However, in supplemental instructions, the court told the jury they could award special damages for churning regardless of the lack of supervision. The jurors found that the executors did not lack the competence to manage the account, and this would ordinarily dispose of the churning claim. But since the case must be retried, we will comment briefly on this aspect of it.

▆▆ Churning occurs when a broker, exercising control over the volume and frequency of trading, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account. Its hallmarks are disproportionate turnover, frequent in and out trading, and large brokerage commissions. It is a deceptive device made actionable by § 10(b) of the Securities Exchange Act and S.E.C. Rule 10b–5. Landry v. Hemphill, Noyes & Co., 473 F.2d 365, 368 n. 1 (1st Cir. 1973); Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836, 845 (E.D.Va.1968); Moscarelli v. Stamm, 288 F.Supp. 453, 457 (E.D.N.Y.1968); *see generally* Note, Churning by Securities Dealers, 80 Harv.L.Rev. 869, 874 (1967).

▆ The structure and investment objectives of an account must be considered to determine whether trading is excessive. Landry v. Hemphill, Noyes & Co., 473 F.2d 365, 373–74 (1st Cir. 1973); Hecht v. Harris, Upham & Co., 283 F.Supp. 417, 432 (N.D.Cal.1968), aff'd, 430 F.2d 1202 (9th Cir. 1970). Since this was a fully margined account comprising nearly all the assets of a decedent's estate, trades to meet margin calls or to switch into less speculative stocks had a legitimate purpose. Therefore, the sales in May to meet margin calls and the purchases of utility stocks did not constitute churning. Moreover, the sale of 10,-600 shares of a fast declining electronics stock in April was not excessive. The district court, therefore, correctly granted summary judgment against the executors on their claim of churning with respect to transactions that occurred before June 1, 1970.

▆ The high volume of in and out trading in June and July, however, was arguably unsuited to the account's size and character. Each party maintains that the other controlled and initiated it. The executors, disparaging their experience and knowledge of the market, claim Burns was responsible. In contrast, the brokers insist that Bill Carras was fully competent to manage the account and that he made the decisions. These conflicts, together with the volume and character of the June and July trading, presented sufficient evidence of churning to submit the issue to the jury. However, the phrasing of the special verdict erroneously suggested to the jury that liability can be imposed only when a customer who lacks the competence to manage an account expressly gives the broker sole authority and control over the account.

▆ Control of trading is an essential element of churning. In the absence of an express agreement, control may be inferred from the broker-customer relationship when the customer lacks the ability to manage the account and must take the broker's word for what is happening. Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Va.1968); Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968); R. H. Johnson & Co., 36 S.E.C. 467 (1955). However, a customer retains control of his account if he has sufficient financial acumen to determine his own best interests and he acquiesces in the broker's management. Carr v. Warner, 137 F.Supp. 611 (D.Mass.1955); *cf.* Landry v. Hemphill, Noyes & Co., 473 F.2d 365, 373 (1st Cir. 1973); Hecht v. Harris, Upham & Co., 430 F.2d 1202, 1207–09 (9th Cir. 1970). The issue is

whether or not the customer, based on the information available to him and his ability to interpret it, can independently evaluate his broker's suggestions. Contrary to the phrasing of the questions in the special verdict, the executors did not have to prove both that they lacked the competence to manage the account and also that they gave control to Burns. Lack of competence itself may give rise to an inference of control.

■ The district court held that damages for churning should be limited to the brokers' commissions and the executors' expenses. The executors contend that their damages should compensate for their lost equity, as measured by the difference in the value of the account before and after churning. It is not our intention to rule that full compensation for lost equity can never be recovered in a churning case. *See* Twomey v. Mitchum, Jones & Templeton, Inc., 262 Cal. App.2d 690, 69 Cal.Rptr. 222, 250 (1968); *cf.* Affiliated Ute Citizens v. United States, 406 U.S. 128, 154–56, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *see generally* 6 Loss, Securities Regulation 3679 (1969); Note, Churning by Securities Dealers, 80 Harv.L.Rev. 869, 883–87 (1967). Here, however, it is not possible to determine what the account would have been worth had there been no churning. The account was so highly leveraged and the market decline so precipitous that it was necessary to meet margin calls. The market fluctuated after the margin debt had been reduced, and there is no basis for assuming what stocks the account would have held in June and July but for churning. Any attempt to apportion loss of equity in this margin account between churning and the ordinary hazards of a declining market would be unduly speculative. On the facts of this case, damages for churning should be limited to the ascertainable losses to the account, including commissions, service charges, and taxes attributable to trading. *See* Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836, 850 (E.D.Va.1968).

■ Recovery of damages should be restricted to the trading in June and July 1970, excluding sales to meet margin calls. If the jury finds that the account was churned during this period, the brokers cannot complain that for the purpose of computing damages all trades other than those to meet margin calls are considered excessive. Since churning is a wrongful series of transactions, any uncertainty about the fitness of particular trades falls on the party who created the situation. *See* Gratz v. Claughton, 187 F.2d 46, 51 (2d Cir. 1951); Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836, 850 (E.D.Va.1968).

■ Finally, Merrill Lynch's liability for churning would not depend solely on its lack of effective supervision, but would also arise from familiar principles of an employer's vicarious liability. Johns Hopkins University v. Hutton, 422 F.2d 1124, 1130 (4th Cir. 1970). The district court belatedly told the jury this in a supplemental instruction, but the possibility of confusion remained because the special verdict form was not amended.

## IV

■ The executors assign error to the district court's refusal to submit to the jury their pendant state law claim for common law fraud and punitive damages. Since submission of the issues under Rule 10b–5 affords the executors adequate relief for fraud, except punitive damages, the practical effect of the court's ruling was to bar their $2,000,000 claim for punitive damages. We find no reversible error in this aspect of the case.

The Securities Exchange Act of 1934 forbids a person who brings a suit under the Act from recovering "a total amount in excess of his actual damages."[5] We have relied on this statute as one reason, among others, for denying punitive damages in an action based on Rule 10b–5. Baumel v. Rosen, 412 F.2d 571, 576 (4th Cir. 1969); *accord,* deHaas v. Empire Petroleum Co., 435 F.2d 1223, 1229 (10th

5. Securities Act of 1934, § 28(a), 15 U.S.C. § 78bb(a).

Cir. 1971); Green v. Wolf Corp., 406 F.2d 291, 302 (2d Cir. 1968); *cf.* Globus v. Law Research Service, Inc., 418 F.2d 1276, 1283 (2d Cir. 1969); Myzel v. Fields, 386 F.2d 718, 748 (8th Cir. 1967) (dictum). As these cases indicate, the burden on the securities business from punitive damages is considered to outweigh their contribution to enforcement of securities laws.

We need not decide in this case whether the federal policy should control a district court's decision to try a pendant claim for punitive damages under state law. North Carolina does not allow punitive damages without evidence of "insult, indignity, malice, oppression, or bad motive;" simple fraudulent representations are insufficient. Swinton v. Savoy Realty Co., 236 N.C. 723, 726, 73 S.E.2d 785, 788 (1953). Since the jury found that the brokers lacked even common law intent to defraud, an award of punitive damages would be inappropriate under state law. We therefore find no error in the district court's ruling.

### V

Rule 431 of the New York Stock Exchange and Rule 462 of the American Stock Exchange require that an investor's equity in a margin account be maintained at not less than 25 percent of the market value of the securities in the account. Merrill Lynch requires maintenance of the equity at not less than 30 percent. But in April and May the brokers failed to make timely margin calls to maintain the estate's equity. The executors assign error to the district court's refusal to submit to the jury their claim for damages arising out of breach of these rules.[6]

▆▆▆▆▆ Margin maintenance requirements are established primarily to protect the solvency of brokers by assuring adequate collateral for their loans that finance customer speculation. *See* Gordon v. duPont Glore Forgan Inc., 487 F.2d 1260, 1263 (5th Cir. 1973); Good-

body & Co. v. Penjaska, 8 Mich.App. 64, 153 N.W.2d 665 (1967). Since they were not promulgated for the protection of investors, they create no cause of action. *Cf.* Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, 410 F.2d 135, 142 (7th Cir. 1969); Colonial Realty Corp. v. Bache & Co., 358 F.2d 178, 182 (2d Cir. 1966); *see generally* Lowenfels, Implied Liabilities Based Upon Stock Exchange Rules, 66 Colum.L.Rev. 12, 29 (1966). The broker may be disciplined for violation of the margin rules, but he would be liable to his customer only if his breach of the rules also violates the Act by operating as a fraud. The late margin call was made by Merrill Lynch's margin department in New York, and it was unrelated to Burns' conduct. No evidence refutes the defendants' testimony that the delay resulted from clerical error. The violation of the margin maintenance rules in this case, standing alone, is at most only a breach of the margin contract and not a violation of the Act. Shemtob v. Shearson, Hammill & Co., Inc., 448 F.2d 442 (2d Cir. 1971).

▆▆▆▆▆ The executors also contend that the district court erred by refusing to submit to the jury as a separate cause of action the alleged violation of the New York and American Stock Exchanges' "know your customer" rules. Rule 405 of the New York Stock Exchange and Rule 411 of the American Exchange require member firms not to open an account until a partner or shareholder has used due diligence to learn the background of the persons concerned and then specifically approved it. The firms must also supervise all accounts handled by its registered representatives. In its charge the district court mentioned the rules, but it did not treat them as giving rise to a separate cause of action apart from Rule 10b–5.

We find no merit in the executors' contention. Merrill Lynch's liability is not dependent on proof that it violated the "know your customer" rules. Under

---

**6.** Liability for violation of the initial margin requirements of the Federal Reserve Board's Regulation T, 12 C.F.R. § 220, is not an issue in this case.

well settled principles of agency, it would be vicariously liable if Burns acted unlawfully. Affiliated Ute Citizens v. United States, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Johns Hopkins University v. Hutton, 422 F.2d 1124, 1130 (4th Cir. 1970).

## VI

The executors assign error to the district court's refusal to submit their claim of usury to the jury. They concede that they cannot recover under state law because this aspect of their case is barred by limitations, but they contend that Merrill Lynch's charging an interest rate higher than the state maximum violates Rule 10b–5. However, there was no evidence that the firm concealed or misrepresented its interest rates; to the contrary, the monthly statements disclosed them. Without any evidence of deception, the mere charging of the higher rate shows no violation of the rule. We find no error in the district court's ruling.

The judgment is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. The executors shall recover their costs.