John E. THOMPSON

v.

SMITH BARNEY, HARRIS UPHAM
& CO., INC.

Civ. A. No. C79-334.

United States District Court,
N. D. Georgia,
Atlanta Division.

April 1, 1982.

J. D. Humphries, III, Varner, Stephens, Wingfield, McIntyre & Humphries, Atlanta, Ga., for plaintiff.

Paul W. Stivers, Rogers & Hardin, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

Plaintiff John Thompson alleges that Defendant, a brokerage firm, violated the federal securities laws and committed common law fraud in connection with transactions effected on his behalf between January and July of 1978. He seeks compensatory and punitive damages. For the reasons given below, the Court concludes Plaintiff is unable to recover on any of these grounds.

## FINDINGS OF FACT

Plaintiff initially met Bruce Brookshire in the summer of 1977 "around the pool" at the apartment complex where both lived. Plaintiff had observed him there, working on various office files while sunbathing. In the course of their conversation, Plaintiff learned Brookshire was a stock broker and that the materials he was reviewing pertained to investments he was researching. Plaintiff was impressed with Brookshire's apparent knowledge of the market and also with his apparent diligence. Casual mention was made of the possibility of Brookshire handling some investments for Plaintiff.

Plaintiff Thompson is a businessman and former mayoral candidate in Atlanta. At the time of the transactions in question here, he was a salaried middle management employee of a paper company and also ran a part-time sales business of his own. He had some limited experience with stock market transactions, and had invested in speculative real estate. The Court finds Plaintiff is an experienced businessman with the general ability to recognize and capitalize on favorable investment opportunities.

At the time of the transactions at issue, Bruce Brookshire was a relatively inexperienced stockbroker, having been out of college for less than two years. The Court further finds that Mr. Brookshire was in fact diligent and hard working, and quite committed to success in his chosen career. The Court further finds that Mr. Brookshire had unlimited confidence in his ability to predict future turns of the market.

In September 1977, Plaintiff opened an account with Defendant. Brookshire, Defendant's employee, was the salesman handling the account. During the period from September through December, 1977, Brookshire handled Plaintiff's investment account on a cash basis. Initially, Brookshire's role was that of order taker, however, he began to suggest investments for Plaintiff. During this three-month interval, the two would discuss proposed investments in detail; Plaintiff would provide the funds and Brookshire would place the order. During this time Plaintiff began to feel a fair amount of confidence in Brookshire's judgment. Ultimately, Brookshire convinced him he could make a great deal more money

if he would convert the account to a margin account so as to permit purchases on a leveraged basis.

In December, 1977 Plaintiff converted the account to a margin account. However, it remained a nondiscretionary account—*i.e.*, one in which the broker does not have the right to make investment decisions for the customer.

On December 8, 1977, Plaintiff signed an "Option Account Agreement" which he then returned to Defendant. Plaintiff and Brookshire had never specifically discussed opening an option account, though they had mutually decided to seek more aggressive forms of investments for Plaintiff.

Paragraph 1 of the "Option Account Agreement" states in part that the undersigned has read the current prospectus of the Options Clearing Corporation (OCC), is aware that options are "inherently highly speculative," and agrees that options trading is not "an unsuitable activity" for him. Paragraph 6 of that agreement further provides:

[i]n order to induce [Defendant] to effect transactions in Options for my account as I may request from time to time and in order to provide [Defendant] with reasonable grounds for believing that such transactions for my account are not unsuitable for me in light of my experience and knowledge and my investment objectives, financial situation and needs, I have furnished to [Defendant] accurate information concerning my experience and knowledge and my investment objectives, financial situation and needs...

Defendant's Exhibit No. 1. The court nevertheless finds that the OCC prospectus cited in the agreement was in fact not received by Plaintiff prior to the transactions at issue here. The Court also finds Plaintiff did not read the Option Account Agreement before he signed it.

During the entire time of Brookshire's association with Plaintiff, there was never any discussion between the two as to the extent of Plaintiff's financial resources or his prior dealings in the market. Brookshire never asked, nor did Plaintiff volunteer, any information concerning Plaintiff's salary, other income, net worth or experience in stock dealings. Brookshire inferred from Plaintiff's manner of dress, demeanor, and the fact that he had run for mayor, that Plaintiff had a better than average income and above-average business acumen.

In January 1978, Brookshire filled out an "Option Information Sheet" containing estimates of Plaintiff's net worth and annual income, which he set at $150,000 and $75,000, respectively. Defendant's internal rules required that such information be obtained as a prerequisite for opening an option account. Brookshire did not contact Thompson before filling out the sheet and made no effort to obtain any reliable information. Rather, he selected the referenced figures because they were adequate to satisfy Defendant's requirements.

The evidence at the trial showed that Plaintiff's net worth and income were dramatically less than the figures selected by Brookshire.

Beginning in January 1978, Brookshire took the initiative in recommending investments to Plaintiff. From time to time he would call Plaintiff and suggest that a particular stock be sold and another purchased. None of the securities purchased for Plaintiff's account were held for any considerable period of time. A review of Plaintiff's account from January through July, 1978 indicates a consistent pattern of purchases and quick sales. It is obvious Plaintiff was "playing the market."

In January 1978, Brookshire recommended to Plaintiff that he purchase 20 IBM July 240 puts.

Testimony at the trial showed that a put is a form of option. More specifically, a "put" is a security representing the right to sell a certain number of shares of stock at a stated price up to a certain date. For example, one "IBM 240 July put" (referred to in the preceding paragraph) represented the right to sell 100 shares of IBM stock at $240 each up to a certain date in July, 1978. The value of a put increases as the price of the underlying stock decreases. The holder of a

put is betting that the underlying security will decline in value. Changes in the value of the underlying security have a dramatic impact on the price of a put. Virtually overnight, a put may double in value or become worthless. Also, as the expiration date of the put approaches, its value decreases; after the expiration date, it is worthless.

Particularly at the time in question here, puts were not a well known or well-understood form of investment to the average investor. Brookshire was aware of this.

Brookshire and Plaintiff discussed the proposed purchase of 20 IBM July 240 puts. At the trial, neither was able to offer much specific testimony as to the substance of that conversation, from which the Court deduces it must have been brief and rather general in nature. The Court finds Brookshire did not specifically warn Thompson that puts are an unusually risky form of investment. It is clear that Thompson was unsure following the conversation what a "put" was. He thought he was purchasing something in the nature of a warrant, or an option with properties similar to a real estate option.

The Court has pondered at length the question of whether or not Brookshire realized Thompson did not know what a put is. Brookshire impressed the Court as being highly intelligent. As mentioned previously, he was quite self-confident. Thus, could it be he did know or suspect that Thompson did not understand the transaction, but nonetheless chose to proceed with it, in the belief that it would turn out well? After some hesitation, the Court elects not to draw such a conclusion. The reason is simply that the evidence on this point is not clear enough; the evidence does not preponderate in Plaintiff's favor. Plaintiff himself gave no specific testimony from which the Court could conclude that Brookshire realized Thompson's confusion. Moreover, Plaintiff's demeanor as observed by the Court is bold and assertive. He did not appear to be one likely to dwell on or readily admit his uncertainties. Taking the evidence as a whole, the Court is unable to conclude that Brookshire knew Thompson did not understand the put transaction.

In any event, the IBM puts were purchased and held for a period of three days, when they were sold at a 23% profit. The success of this transaction, as well as other unusually profitable transactions [1] handled by Brookshire for Plaintiff in the spring of 1978, caused Plaintiff to have a growing sense of Brookshire's infallibility. Although they still discussed most purchases before Brookshire made them for Plaintiff's account, Plaintiff's tendency by the spring of 1978 was to defer almost totally to Brookshire's judgment.

In July of 1978, Brookshire recommended to Plaintiff that he purchase 50 IBM October 260 puts. Brookshire told Plaintiff this would require $20,000, which at that time was equal to about 35% of the value of Plaintiff's portfolio. At the time Brookshire made this suggestion, Plaintiff still did not know what a put was. He did know that puts are an "oddball" investment. He also knew from his prior experience that an exceptionally handsome return could be made on them in a short time. From this the Court deduces that Thompson, as an experienced businessman, knew or suspected that puts entail risks greater than those inherent in stocks, although he lacked sufficient understanding of the facts to quantify those risks. However, Thompson did not ask any specific questions about the nature of puts, or the risks inherent in their purchase, at that time. Neither did Brookshire volunteer any.

Plaintiff authorized Brookshire to purchase the 50 IBM 260 October puts for his account. A few days later Brookshire advised he had miscalculated the amount of money needed to purchase the puts. He originally had told Plaintiff that by liquidating certain securities already in the account, funds in the approximate amount of $20,000 could be generated which would cover the purchase. However, it now ap-

1. In April 1978, Brookshire purchased 50 General Motors October 260 puts for Plaintiff's account. They were sold after a month at a profit of 33%.

peared that the amount required to purchase the puts was about $34,000, thus necessitating Plaintiff's obtaining $14,000 in cash to complete the purchase, as the transaction could not be handled on a margin basis. During the same telephone call, Brookshire told Plaintiff he could, if he wished, elect not to complete the transaction and that in such event, Brookshire himself would bear any loss occasioned by it. However, Brookshire urged Plaintiff to go ahead and complete the transaction, stating he believed it would be profitable. Brookshire pointed out to Plaintiff that Brookshire himself had purchased these puts for his own account and indeed, he had.

Plaintiff elected to complete the transaction and borrowed $14,000 to do it. The puts were purchased on July 19, 1978 at a price of $33,750, or 6¾ per put (each of the 50 puts represented 100 shares; thus 50 × 100 × 6.75 = $33,750). With commission, the total cost was $34,324.50.

Almost immediately after the purchase, the value of the puts began declining. However, Thompson was unaware of this until Friday, July 27 when he called Brookshire's office. He was informed the puts had declined into the $4 or $5 range and that Brookshire was out of town. Brookshire called Plaintiff on Monday, July 31 and told him the puts were down under $4. Brookshire initially recommended against selling them as he thought their value might rise again. However, he quickly changed his mind as the price continued to plummet. On August 1 Brookshire recommended that Plaintiff sell the puts. He advised Plaintiff he had lost $20,000, and told him it was unlikely the price would rise again. He advised him to borrow more money and pledged he would make up the loss through future investments.

Plaintiff, who did not comprehend that the options would be worth nothing if not exercised by October, felt that such a fluctuating security could still rise in value and resisted selling. At an August 15 meeting, Plaintiff informed Brookshire he would henceforth handle his own account.

On September 7, 1978, Defendant sold the IBM puts at Plaintiff's personal direction. The loss was $32,652 which Plaintiff seeks to recoup in the within litigation.

## CONCLUSIONS OF LAW

I. *10b–5 Claims* [2]

A. *"Churning"*

 At trial, Defendant's motion to dismiss Plaintiff's "churning" claims was granted. The Court now explains the reasons for this decision. "Churning" is excessive trading by a broker or dealer disproportionate to the size and character of the account, effected primarily for the purpose of generating commissions rather than benefitting customers. The practice has been held to violate 15 U.S.C. § 78j(b). *See Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 432 (N.D.Cal.1968), *modified*, 430 F.2d 1202 (9th Cir. 1970). "The structure and investment objective of an account must be considered to determine whether trading is excessive." *Carras v. Burns*, 516 F.2d 251, 258 (4th Cir. 1975). Three elements are essential to establishing "churning": (1) excessive trading in light of investment objectives; (2) control by the broker over the trading in the account; (3) intent to defraud or willful and reckless disregard for investor's interests. *See Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318 (5th Cir. 1981).

 In the instant case, Plaintiff knew his account was being constantly traded. He also knew the securities being purchased yielded returns inconsistent with conservative investment objectives. Yet, he did not object but continued to acquiesce in Brookshire's recommendations. Thus, the Court is unable to conclude that the account was excessively traded. Although Plaintiff did not fully comprehend the risks involved in all of the sophisticated transactions recommended to him, he had "sufficient financial acumen to determine his own best interests" *Carras v. Burns*, 516 F.2d 251, 258 (4th Cir. 1975) and desired frequent trading of the sort effected.

**2.** The Court's disposition of Plaintiff's 10b–5 claims *ipso facto* disposes of his common law fraud claims. Hence, they are not separately discussed.

### B. Other 10b–5 Issues

Plaintiff further claims Defendant violated Rule 10b–5 when it failed to warn Plaintiff of the unusual risks inherent in trading in puts.

Rule 10b–5 provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

■ In the Court's opinion, subsection (a) and (b) of the Rule furnish no basis for a cause of action here. There is no evidence that Brookshire employed any "scheme" to defraud Plaintiff. Further, Brookshire made no untrue statements to Thompson; neither did he make any misleading statements.

■ Turning to subsection (c) of the Rule, it appears that the viability of Plaintiff's cause of action rests initially on whether Defendant may be liable for omitting to state a material fact with respect to the puts. It may be, if Defendant had a duty to speak. This duty arises when the parties' relationship is one of trust and confidence; i.e. a fiduciary relationship. See First Virginia Bankshares v. Benson, 559 F.2d 1307 (5th Cir. 1977), cert. denied sub nom., Walter E. Heller & Co. v. First Virginia Bankshares, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). Moreover, by analogy to state law, it would seem that actionable fraud may arise, even absent a fiduciary relationship, where there is active concealment of a latent defect or an intrinsic quality of the property being sold which

is difficult for the purchaser to discover. Similarly, one who takes advantage of a party he knows to be laboring under a delusion may be liable for fraud, even absent a fiduciary relationship. See Young v. Hirsch, 187 Ga. 1, 199 S.E. 179 (1938).

Interesting and difficult issues are presented in determining the precise nature of the relationship between Plaintiff and Defendant here, and extent of Defendant's duty to Plaintiff. However, the Court finds it is unnecessary to resolve these knotty issues because it is convinced that even if they are resolved in Thompson's favor, he is still not entitled to prevail.

■ First, implicit in an omission-to-disclose case is proof by Plaintiff that he did not know of the omitted fact, and could not, with reasonable diligence, have discovered such fact. Here, Thompson urges he did not know of the risks inherent in puts; he relied on Brookshire. However, the Court does not accept this argument. Thompson knew, in the spring of 1978, of the extraordinary profits he had made in puts. He knew these profits had accrued very rapidly. As an experienced businessman, he doubtless also knew instinctively that an opportunity for extraordinary profit is usually accompanied by risk of extraordinary loss. At the very least, he knew enough to inquire further of Brookshire and was not entitled to blindly rely on Brookshire's instincts that the IBM October 260 puts would be profitable. Secondly, the Court finds that the representations made by Thompson in the Option Account Agreement estop him from asserting that he was unaware of the risks inherent in options trading. Cf. Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970) (defense of estoppel available in federal securities action); Bohannon v. Manhattan Life Insurance Co., 555 F.2d 1205 (5th Cir. 1977) (under Georgia law, knowledge required for equitable estoppel may be actual or constructive).

### II. Implied Right of Action

Plaintiff also seeks to imply a private cause of action under the federal securities laws for violation of the New York Stock Exchange "know your customer" rule and

of the National Association of Securities Dealers' "suitability" rule. The rules in question are as follows:

> Every member organization is required ... to (1) use due diligence to learn the essential facts relative to every customer....

Rule 405, New York Stock Exchange.

> In recommending to a customer the purchase, sale or exchange of any security a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

Section 2, Article III of the Rules of Fair Practice of the National Association of Securities Dealers.

There is a division of authority as to whether private causes of action exist as urged by Plaintiff. *Compare Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman*, 593 F.2d 129 (8th Cir. 1979), *cert. denied*, 444 U.S. 838, 100 S.Ct. 76, 62 L.Ed.2d 50 (1980) *and Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir.) *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969) (private cause of action exists where accompanied by allegations of fraud) *with Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir. 1980) (no implied private right of action for violation of "know your customer" and "suitability" rules). The Court of Appeals of this Circuit has not addressed this issue. *See, e.g., Wolfson v. Baker*, 623 F.2d 1074, 1081–82 (5th Cir. 1980), *cert. denied*, 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981). Recent Supreme Court cases tend to discourage the implication of private remedies under the securities laws. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), *on remand*, 610 F.2d 648 (9th Cir. 1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), *on remand*, 612 F.2d 68 (2d Cir. 1979).

█ In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court laid out a four-part analysis for determining whether a private right of action may be implied under a federal statute. *Touche Ross* and *Transamerica* indicate that the most important of these factors is whether Congress intended, expressly or by implication, to create a private cause of action.

█ There is no express indication of congressional intent here, of course. Since the Supreme Court, in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), interpreted Section 10b–5 narrowly to require a showing of intent, it would be inconsistent to find congressional intent, by implication, to establish the private causes of action urged by Plaintiff, which are more akin to negligence causes of action.

Hence, the Court holds that no private causes of action exist under Rule 405 of the New York Stock Exchange, or Section 2, Article III of the Rules of Fair Practice of the National Association of Securities Dealers.

For the reasons given above, the Court hereby ORDERS judgment for Defendant.