**John E. THOMPSON, Plaintiff-Appellant,**

v.

**SMITH BARNEY, HARRIS UPHAM & CO., INCORPORATED, Defendant-Appellee.**

**No. 82–8247.**

United States Court of Appeals, Eleventh Circuit.

July 18, 1983.

---

Carolyn T. Thurston, J.D. Humphries, III, Atlanta, Ga., for plaintiff-appellant.

Paul W. Stivers, Atlanta, Ga., for defendant-appellee.

Before FAY, HENDERSON and HATCHETT, Circuit Judges.

FAY, Circuit Judge:

The appellant filed suit against Smith Barney, Harris Upham & Co., Inc. alleging that the brokerage firm and its employee, Bruce Brookshire, failed to disclose to him risks inherent in options trading. He further alleged that Smith Barney churned his account in violation of sec. 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. sec. 78j(b), Rule 10b–5, 17 C.F.R. sec. 240.-10b–5, and state common law. The district court granted Smith Barney's motion to dismiss the appellant's churning claim at the close of the appellant's case. After a full trial on the other counts, the district court found for Smith Barney and judgment was entered accordingly. We affirm the judgment of the district court and uphold the dismissal of the churning claim.

## FACTS

The facts relevant to this appeal may be summarized as follows: The appellant opened a cash account with Smith Barney, Harris Upham & Co., Inc. in September 1977. Mr. Brookshire, an employee of Smith Barney, was the salesman handling the account. In December 1977, the appellant converted his account into a margin account. On December 8, 1977, Mr. Thompson signed an "option account agreement," which he mailed back to Smith Barney. The appellant and Mr. Brookshire never specifically discussed opening an option account, though they had mutually decided to seek more aggressive forms of investments for the appellant. The option account agreement that the appellant signed specifically states that he is aware that options are "inherently highly speculative," and that he agrees that options trading is not "an unsuitable activity" for him. The agreement also provided,

> [i]n order to induce [Smith Barney] to effect transactions in Options from my account as I may request from time to time and in order to provide [Smith Barney] with reasonable grounds for believing that such transactions for my account are not unsuitable for me in light of my experience and knowledge and my investment objectives, financial situation and needs, have furnished to [Smith Barney]

accurate information concerning my experience and knowledge and my investment objectives, financial situation and needs . . . .

*Thompson v. Smith Barney, Harris Upham & Co.,* 539 F.Supp. 859, 861 (N.D.Ga.1982).

During the entire time of Mr. Brookshire's association with the appellant, there was never any discussion between the two as to the extent of appellant's financial resources or his prior dealings in the market. Mr. Brookshire never asked, nor did the appellant volunteer, any information concerning the appellant's salary, other income, net worth or experience in stock dealings.

In January 1978, Mr. Brookshire filled out an "Option Information Sheet" containing estimates of appellant's net worth and annual income, which he set at $150,000 and $75,000, respectively. Smith Barney's internal rules required that such information be obtained as a prerequisite for opening an option account. "Mr. Brookshire did not contact the appellant before filling out the sheet and made no effort to obtain any reliable information. Rather, he selected the referenced figures because they were adequate to satisfy [Smith Barney's] requirements." *Thompson v. Smith Barney* at 861.

In January 1978, Mr. Brookshire recommended to the appellant that he purchase 20 IBM July 240 puts.[1] The two men discussed this proposed purchase, although the discussion was brief and general in nature. The IBM puts purchased were held for only three days, when they were sold for a 23% profit.

In early 1978, the appellant told Mr. Brookshire that he was having difficulty understanding his monthly statements. The appellant and Mr. Brookshire met per-

---

1. A put is a form of option that gives its holder the right to sell one hundred shares of the underlying stock at a specified price on or before a specified date. As the trial judge explained in her opinion, one IBM 240 July put bought in 1978 gives its owner the right to sell 100 shares of IBM stock at $240 each up to a certain date in July, 1978. After this date, the option expires and has no value. *Thompson v. Smith Barney* at 861. The risk of a purchaser of a put is limited to his or her actual investment in it. The put becomes more valuable as the price of the underlying stock declines. Conversely, should the price of the underlying stock rise, the put become less valuable.

sonally in February 1978 to review the appellant's account records. At this time Mr. Brookshire addressed any questions the appellant had about his account. In the following months, a number of successful short-term investments were made in the appellant's account, including a purchase of 50 General Motors October 260 puts, which were sold for a profit of 33% after being held for only one month, a purchase of 2,000 shares of Yates Industries stock, which were sold for a $1,538.13 profit after being held for approximately five weeks, and a purchase of 4,000 shares of King's Department Stores stock, of which 600 shares were sold for a profit of approximately $551.00 after being held for less than a week.

In July of 1978, the appellant authorized Mr. Brookshire to purchase 50 IBM October 260 puts at 6¾ each for his account. Within a few days of this authorization, however, Mr. Brookshire realized that he had made an error regarding the amount of money available in the appellant's account to pay for the 50 IBM puts. He advised the appellant that he had sufficient funds in his account to pay for only 25 of the 50 puts. Mr. Brookshire also informed the appellant that the price of the IBM puts was down slightly from their purchase price. After being so informed, the appellant agreed to supply the additional $14,000.00 necessary to purchase the remaining 25 puts.

Almost immediately after the purchase, the value of the IBM puts began declining. The appellant called Mr. Brookshire's office on Friday and discovered that the price of the puts had declined into the $4.00 to $5.00 range. Mr. Brookshire called the appellant the following Monday, July 31, and told him

that the price of the puts had fallen below $4.00, but recommended against selling them. The next day, however, Mr. Brookshire changed his mind and advised the appellant to sell the puts. The appellant refused, although Mr. Brookshire and the other customers to whom he had recommended the purchase of these puts did so. The appellant persisted in his refusal to sell, and, at an August fifteenth meeting, the appellant advised Mr. Brookshire that he would henceforth handle his own account. The appellant finally sold thirty of the IBM puts at ⅜ and the remaining twenty at ⁵⁄₁₆, on September 7, 1978, for a total loss of $32,652.00.

## DISCUSSION

*Churning Claim*

The trial court granted the appellee's motion to dismiss the appellant's churning claim at the close of the appellant's case. Appellant asserts that this was error as a matter of law. We disagree.

 Churning occurs when a securities broker buys and sells securities for a customer's account, without regard to the customer's investment interests, for the purpose of generating commissions. *McNeal v. Paine, Webber, Jackson & Curtis, Inc.,* 598 F.2d 888, 890 n. 1 (5th Cir.1979).[2] To establish a cause of action for churning under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. sec. 78j(b), and S.E.C. Rule 10b–5,[3] an investor must establish that "(1) the trading in his account was excessive in light of his investment objectives; (2) the broker in question exercised control

---

**2.** This circuit has adopted as binding precedent the decisional law of the former fifth circuit that was published before October 1, 1981. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

**3.** The Securities & Exchange Commission's Rule 10b–5, promulgated under the general anti-fraud provisions of the Securities Exchange Act of 1934 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, (1)

to employ any device, scheme or artifice to defraud; (2) to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (3) to engage in any act, practice, or course of business which would operate as a fraud of deceit upon any person ... in connection with the purchase or sale of any security."

Churning is classified as a "device, scheme or artifice to defraud," and thus, is within the purview of the rule.

over the trading in the account; and (3) the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interest." *Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318, 324 (5th Cir.1981).

At trial, the litigants' versions of the events giving rise to this litigation were similar to the contentions of opposing parties in most churning cases. The appellant, like most churning plaintiffs, argued that he was an unsophisticated investor with limited financial resources, and that his investment objectives were merely conservative in growth in order to insure the safety of his principal. "As in most churning cases, [the appellant] then had an expert testify that in light of these conservative investment objectives, the transactions in the account were excessive in size and frequency." *Miley* at 325.

As to be expected, Smith Barney presented a different picture of the broker-client relationship at issue. Like most churning defendants, Smith Barney characterized their client as an experienced investor who was interested in quick, short-term gains; they argued that the appellant's investment goal was speculation, not capital conservatism, and that the transactions in the account were quite reasonable in light of these speculative objectives.

The trial court in this case, as in similar churning suits, was faced with the difficult task of choosing between these two scenarios. "Moreover, it is indeed possible, and, perhaps, probable that the truth lay somewhere in between the two conflicting stories. [The appellant] may, in fact, have been somewhat disgruntled at having lost at what was clearly a gambler's game,

while [Smith Barney] may, in fact, have tended to err on the side of entering into, rather than of passing up, a somewhat risky investment in order to earn the related commissions." *Miley,* at 325. With the wide disparity of the stories presented by the opposing parties, the trial court's task was to make credibility choices and find the facts accordingly. Our review of the trial court's findings of fact is limited by the "clearly erroneous" standard.[4]

■ The trial court dismissed the appellant's churning claim on the ground that the account had not been excessively traded. We recognize that "[t]he structure and investment objective of an account must be considered to determine whether trading is excessive." *Carras v. Burns,* 516 F.2d 251, 258 (4th Cir.1975). On this point, the trial court specifically found that the appellant was a trader "playing the market" who desired frequent trading of the sort effected in his account. The court also found that the appellant knew that the securities that were purchased yielded returns inconsistent with conservative investment objectives, but did not question the returns because they were in line with his goal of making money as fast as possible. *Thompson v. Smith Barney* at 863.[5] We find no error in these factual findings. Moreover, after carefully examining the record in this case, particularly the testimony relevant to the appellant's churning claim, we are not left with a definite and firm conviction that a mistake has been committed on the question of excessive trading. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Kingsville Independent School District v.*

4. Fed.R.Civ.P. 41(b) provides that "[a]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant ... may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff... If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)."

Fed.R.Civ.P. 52(a) provides that "in all actions tried upon the facts without a jury ... the court shall find facts specially and state

separately its conclusions of law thereon ... [and] [f]indings of fact shall not be set aside unless clearly erroneous."

5. On some transactions the appellant's profits reached as high as 300% on an annualized basis, and on an investment held for only one day, he made over 10% on an absolute basis. As to the latter investment, the appellant testified that he did not inquire about the rapid turnover because he did not worry about his investments "when [he] made money." Tr. vol. 3, pp. 61–62.

*Cooper,* 611 F.2d 1109, 1113 (5th Cir.1980). The dismissal of the appellant's churning claim is upheld.

*Omission-to-Disclose Claim*

The appellant further contends that Smith Barney violated Rule 10b–5 when it failed to warn him of the unusual risks inherent in options trading.

■ The law is clear that a broker owes a duty of full and fair disclosure to a securities investor. *Dupuy v. Dupuy,* 551 F.2d 1005, 1115 (5th Cir.1977). In order to sustain a cause of action under Rule 10b–5, however, the plaintiff must establish "the scienter of the defendant, the materiality of any misrepresentation or omission by the defendant, the extent of actual reliance by the plaintiff on the defendant's statements, and the justifiability of the reliance, frequently translated into a requirement of due diligence by the plaintiff ... [The former Fifth Circuit] established 'due diligence' as a separate element in 10b–5 cases, apart from questions of materiality, reliance, or defendants' duties." *Thompson v. Smith Barney.*

■ Despite the questionable practices of Smith Barney through its employee, Mr. Brookshire,[6] the trial court found that the appellant knew of the unusual risks inher-

ent in options trading, or with the exercise of reasonable diligence, he could have found out about such risks.[7] We agree.

The evidence of record evinces that at the time of the transactions in his Smith Barney account, the appellant was an experienced businessman with the general ability to recognize and capitalize on favorable investment opportunities.[8] Moreover, in December 1977, Smith Barney sent the appellant an options account agreement which clearly stated the risks involved in trading in options. The appellant never bothered to read the agreement, although he signed the document and mailed it back to Smith Barney. The appellant received confirmations following each transaction in his account, as well as monthly statements. The appellant and Mr. Brookshire met personally in February 1978 to review his account. During this meeting, the appellant did not inquire about any of the transactions he now complains were incomprehensible to him; as the appellant stated at trial, there was no need to question any of the transactions in his account because he was making money. Indeed, the appellant never questioned the extraordinary profits he was making off his investments, even though the securities that were purchased yielded returns inconsistent with conservative investment objectives. As the trial court aptly noted,

---

**6.** The evidence adduced at trial shows that in January 1978, Mr. Brookshire filled out an "Option Information Sheet" containing estimates of the appellant's net worth and annual income, which he set at $150,000 and $75,000, respectively. "[Smith Barney's] internal rules required that such information be obtained as a prerequisite for opening an option account. Brookshire did not contact [the appellant] before filling out the sheet and made no effort to obtain any reliable information. Rather, he selected the referenced figures because they were adequate to satisfy [Smith Barney's] requirements." *Thompson v. Smith Barney* at 861.

**7.** As previously noted, in this circuit the requirement of due diligence is a separate element in 10b–5 cases.

By considering independently whether the carelessness of a plaintiff should preclude his recovery, the Court promotes two policies. First, general principles of equity suggest that only those who have pursued their own interests with care and good faith should

qualify for the judicially created private 10b–5 remedies. See *Clement A. Evans & Co. v. McAlpine,* 5 Cir.1970, 434 F.2d 100, 104; *City National Bank v. Vanderboom,* 8 Cir.1970, 422 F.2d 221, 230 n. 10, cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560; Wheeler, Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense to an Implied Remedy, 70 Nw.U.L.Rev. 561, 564–68 (1976) (hereinafter cited Wheeler). Second, by requiring plaintiffs to invest carefully, the Court promotes the anti-fraud policies of the Act and engenders stability in the markets. Wheeler, 70 Nw.U.L.Rev. at 585; Note, The Due Diligence Requirement for Plaintiffs Under Rule 10b–5, 1975 Duke L.J. 753, 760–61. *Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir. 1977).

**8.** At the time of the transactions in question, the appellant was a salaried middle management employee of a paper company. He also ran a part-time sales business of his own. The appellant was a licensed real estate broker and had invested in speculative real estate.

[the appellant] knew, in the spring of 1978, of the extraordinary profits he had made in puts. He knew these profits had accrued very rapidly. As an experienced businessman, he doubtless [sic] also knew instinctively that an opportunity for extraordinary profit is usually accompanied by risk of extraordinary loss. At the very least, he knew enough to inquire further of Brookshire and was not entitled to blindly rely on Brookshire's instincts that the IBM October 260 put would be profitable.

*Thompson v. Smith Barney* at 864.

There is substantial evidence in the record to support the trial court's conclusion that the appellant is precluded from recovering on the omission-to-disclose claim since he knew of the risks associated with options trading, or, with the exercise of reasonable diligence, he could have found out about such risks.

We have considered all of the appellant's contentions raised on appeal, including his contention that there is a private cause of action under the federal securities laws for violation of both the New York Stock Exchange "know your customer rule" and the National Association of Securities Dealers' "suitability" rule, and find them to be without merit. The judgment of the district court is AFFIRMED.