The PINKERTON AND LAWS COMPANY, INC., Plaintiff,

v.

ROADWAY EXPRESS, INC., Defendant,

v.

OWENS–CORNING FIBERGLAS CORPORATION, Giffels, Bergstrom & Fricker, Inc. and St. Paul Fire and Marine Insurance Company, Defendants in Counterclaim.

Civ. A. No. C84–1937A.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 28, 1986.

J. Ben Shapiro, Jr., Atlanta, Ga., for plaintiff.

Harry L. Griffin, W. Henry Parkman, Atlanta, Ga., for defendant.

## ORDER OF COURT

HORACE T. WARD, District Judge.

The court currently has under consideration the following motions: (1) defendant's motion for partial summary judgment; (2) defendant's motion for sanctions; (3) plaintiff's motion for leave to file an amended complaint; (4) plaintiff's motion to supplement the record; (5) defendant's motion to supplement the record; (6) defendant's motion to strike; and (7) plaintiff's motion to dismiss the motion to strike. On May 2, 1986, the court heard oral argument on all motions outstanding as of that date. The court will rule on all pending motions in this order.

*Procedural and Factual Background*

This dispute arises out of a construction project in Ringgold, Georgia. Plaintiff, The Pinkerton and Laws Company ("P & L"), contracted in November 1981 to construct a freight terminal for defendant, Roadway Express, Inc. ("Roadway") in accordance with plans and specifications prepared by Roadway's architect. P & L subcontracted the excavation, grading, and fill portion of the work to Jerome Bradford Construction Company ("Bradford").

After P & L began work on the project, it and Bradford encountered difficulties in achieving the required soil compaction, primarily as a result of excess moisture in the soil. Bradford eventually abandoned the project, and P & L completed Bradford's portion of the work. P & L then brought this action, alleging breach of contract by failure to make progress payments or to disclose soil conditions, and fraudulent misrepresentation of soil conditions at the

project site. Roadway answered and counterclaimed for damages for breach of contract, delay, and negligent construction.[1]

*Motions Regarding the Record*

Before the court addresses Roadway's motion for partial summary judgment, it must resolve the various motions to include additional evidence in the record before the court. Roadway has moved to include excerpts from a second deposition of Lawrence Coil, and has filed the original deposition with the court. P & L has not opposed this motion, but has moved to supplement the record by including the affidavit of an expert witness, James Ahlberg. Roadway has filed an objection to this motion and also has moved to strike Ahlberg's affidavit. Not to be outdone, P & L then moved to dismiss Roadway's motion to strike.

These motions appear to be much ado about nothing. Both parties are entitled to include in the record any form of evidence contemplated by Fed.R.Civ.P. 56(e). Roadway objects to the Ahlberg affidavit on the grounds that it presents inadmissible evidence and does not indicate the affiant has first-hand knowledge of all facts to which he testified. Defendant argues that *Auto Drive-Away Co. v. ICC*, 360 F.2d 446 (5th Cir.1966) requires the court to strike an affidavit containing inadmissible evidence. However, in *Auto Drive-Away*, the former Fifth Circuit did not strike an affidavit, but instead rejected the appellant's challenge to an affidavit because no objection had been made in the lower court. *Id.* at 448–49.

 Several judges in this district have held that the proper method for challenging the admissibility of evidence in an affidavit is to file a notice of objection to the challenged testimony, not a motion to strike. *Friedlander v. Troutman, Sanders, Lockerman & Ashmore*, 595 F.Supp. 1442 (N.D.Ga.1984), *rev'd on other grounds*, 788 F.2d 1500 (11th Cir.1986); *Smith v. Southeastern Stages, Inc.*, 479 F.Supp. 593 (N.D.Ga.1977). This court concludes that *Friedlander* and *Smith* establish the preferred procedure. Affidavits are not included in the category of pleadings that may be subject to a motion to strike pursuant to Fed.R.Civ.P. 12(f). Of course, the court may consider only admissible evidence when deciding a summary judgment motion. However, the court will assess the admissibility of evidence presented through affidavits, depositions, or any other method as part of its consideration of the motion. As part of that assessment, the court will consider any objections to testimony presented in affidavits or any other form of evidence when it rules on the merits of a summary judgment motion.

Accordingly, both motions to supplement the record are GRANTED. The motion to strike is DENIED, and the motion to dismiss the motion to strike is DISMISSED AS MOOT.

*Roadway's Motion for Partial Summary Judgment*

### 1. Findings of Fact

Defendant has moved for summary judgment on Counts 2 and 3 of plaintiff's complaint, which sought damages for additional costs allegedly incurred as a result of excess moisture in the soil at the project site. Count 2 alleged breach of contract by failure to disclose the soil conditions, and Count 3 asserted a claim for fraudulent misrepresentation of the soil conditions. In essence, Roadway argues that P & L should be barred from asserting any claim for damages for extra costs incurred in the soil compaction phase of the project because P & L assumed the risk of any excess moisture or unfavorable site conditions. In response, plaintiff contends that Roadway failed to disclose important information it had regarding the soil conditions in violation of its legal and contractual duties.

---

**1.** Various additional and third-party defendants have been added and dismissed during this litigation. Currently, St. Paul Fire and Marine Insurance Company, R.B. Poole Co., Inc., and the Aetna Casualty & Surety Company are third-party defendants. None of these parties has an interest in any of the outstanding motions.

After reviewing the depositions and affidavits filed in connection with this motion, the court finds the following material facts are not in genuine dispute:

(1) P & L and Roadway entered into a contract in November 1981 whereby P & L agreed to supply the labor and materials necessary to construct a motor freight terminal in Ringgold, Georgia.

(2) The contract documents comprise the Agreement, General and Special Conditions, drawings and specifications, addenda, and any change orders issued during the performance of the job.

(3) Relevant portions of the contract documents provide as follows:

Changes in Work: Changes in work may be ordered only upon written order from Owner. Cost or credit to Owner resulting therefrom shall be calculated in accordance with the method chosen by Owner pursuant to ARTICLE No. 1–18 of the General Conditions.

*Merger of Understandings:* This Agreement represents the entire contract between the parties hereto and supercedes all prior negotiations, representations or agreements, either written or oral. Any and all rights or duties arising hereunder are personal to the Contractor and cannot be assigned or delegated under any circumstances.

1.010—General Conditions

*1–15. Suspension of Work—Delay:*

. . . . .

The Contractor may file proper claims for loss or damage on account of delays incurred by the Owner. If any delay is caused by any act of the Owner, or results from causes hereinbefore mentioned, the Contractor will be granted an extension of time for the completion of the work, sufficient to offset such delay if a claim is made by the Contractor in writing to the Engineer within seven days from the date upon which such delay started. No extension of time shall be granted for time lost during suspension of work due to the Contractor's failure to comply with the conditions or terms of the Agreement.

*1–18. Changes in the Work:*

The Owner, without invalidating the contract, may order extra work, or make changes by altering, adding to, or deducting from the work, the contract sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract, except that the claim for extension of time caused thereby shall be adjusted at the time of ordering such change.

No extra work or change shall be made without a written order from the Owner, in which event the Contractor shall proceed with such extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered.

1.020 Special Conditions

2.2 *Examination of Site:*

The Contractor shall, before submitting his proposal, examine the site, inform himself of the conditions and make his own estimates of the facilities and difficulties attending the execution of the work.

Specifications

2.010 Soil Boring Logs

1.01 General:

Included in this Section of the Specifications are copies of forty-four soil boring logs taken at the site. These logs are part of subsurface investigations performed between February 9 and April 2, 1980, under separate contract by Law Engineering Testing Company, Atlanta, Georgia.

2.200 Earthwork

PART 1—GENERAL

1.01 *Scope of Work:*

A. Under this Section of the Specifications the Contractor shall furnish all labor, plant and materials required to complete the following general items of work:

1. Preparation of areas to receive fills and the constructions of such fills.

2. General excavation and site grading.

3. Finish grading including all slopes, ditches and subgrade preparation.

4. Excavations and backfilling.

5. Spreading of stockpiled top-soil.

B. All general site grading shall be completed before work is started on the building foundations.

The Contractor shall visit the site, inform himself of the conditions and make his own estimates of the facilities and difficulties attending the execution of the work.

1.03 *Inspection and Testing:*

A. The Owner will provide and pay for continuous inspection and testing service using a qualified engineering testing laboratory. It will be the laboratory's decision, in conjunction with the Owner and the Engineer, as to the acceptability of any materials or work containing those materials.

B. If the initial test results fail to met the required specifications, the material shall be reworked and/or removed and recompacted and retested. All costs of reworking and retesting shall be borne by the Contractor.

3.03 *Fill Construction:*

A. Immediately prior to the placing of fill materials the subgrade shall be compacted to a minimum density of 95% of maximum laboratory dry weight as determined by AASHTO Test Designation T–180 (Modified Proctor).

B. Fill materials shall be spread in uniform layers having a maximum thickness, measured loose, of eight inches. Each layer shall be compacted to the density herein specified before the next layer is placed.

C. Fill material shall be compacted at the optimum moisture content plus or minus three percent. The moisture content of each lift shall be adjusted by either aeration with a disk harrow or sprinkling as may be necessary to facilitate proper compaction.

D. The fill material shall be mechanically compacted to a minimum density of ninety-five percent (95%) of maxi-

mum laboratory dry weight as determined by AASHTO Test Designation T–180 (Modified Proctor).

3.05 *Backfills:*

E. All backfill shall be placed in four inch (4″) layers measured and mechanically compacted to a minimum density of 95% of maximum laboratory dry weight as determined by AASHTO Test Designation T–180 (Modified Proctor). Each layer shall be compacted to this density before the next layer is placed.

(4) P & L obtained this contract by submitting a bid in response to a bid invitation from Roadway.

(5) The bid invitation contained all the contract documents, including the specifications.

(6) Before P & L submitted its bid, a company representative visited the site to observe the conditions. He walked approximately one-half of the site, but did not walk through the areas that were covered with dense undergrowth.

(7) Before the general contract was signed, P & L did not ask to see the other reports made by Law Engineering regarding its subsurface investigations that were not included in the contract documents.

(8) P & L did not conduct any soil tests at the site prior to signing the contract.

(9) P & L's initial bid letter contained the following qualifications:

1. Progress Payments—Owner shall be invoiced by the first of the month and shall make payment by the Tenth (10th) of the month.

2. Retainage shall not exceed 5% of the contract amount. This may be accomplished in various ways, for instance 10% for the first half of the project and none thereafter.

3. Modified proctor (95%) compaction on fill construction is contingent on residual soils moisture content of which there is no information given. Our quotation anticipates that this material falls within the acceptable range prior to the start of construction.

(10) Representatives of P & L and Roadway subsequently discussed these bid qualifications because Roadway refused to accept a qualified bid. P & L increased its price by $30,000 because Roadway would not change the payment terms to which P & L had objected. After Roadway's representative stated that there were no unusual soil conditions at the site, P & L removed the remaining qualifications.

(11) P & L entered into a subcontract with Bradford dated November 17, 1981 whereby Bradford agreed to provide the labor and materials necessary to perform the clearing, grading, and fill portion of the work in accordance with the general contract documents.

(12) The subcontract contained the following relevant provision:

All subsurface soil conditions are the responsibility of the subcontractor as it relates to his work described above.

(13) Compaction of soil according to the "modified proctor" test is more difficult to attain than compaction according to the "standard proctor" test, particularly if the soil is very moist.

(14) Once the work began, P & L began experiencing difficulty in achieving the required soil compaction because of excess moisture in the soil. As a result, the earthwork portion of the contract took longer to complete than P & L had anticipated.

(15) Because of these difficulties in achieving the proper soil compaction, Bradford abandoned the job in July 1982.

(16) P & L then completed the earthwork portion of the project.

(17) P & L never presented a written request for a change order or an extension of time to complete the work.

(18) In December 1983, after encountering problems with the construction of one wall of the terminal building, P & L asked Roadway to provide all information Law Engineering had supplied to Roadway.

(19) Roadway furnished the remaining Law Engineering reports and documents to P & L in July 1984.

(20) The additional Law Engineering documents included the following information:

The laboratory results indicate the soils at the site are generally wetter than the optimum moisture content. Therefore, it appears that the site will require some drying out to achieve 95 percent compaction.

During this investigation, extremely soft surface conditions were noted, particularly in the western half of the site. Extensive dozer assistance was required for our drill rig to obtain access to boring locations. This condition can be attributed to very heavy rainfall during March and the tightness of the residual clay which does not allow rapid drainage. Therefore, water tends to sit on the surface and soften a zone 12 to 18 inches deep. This surface zone consist of topsoil and probably a loose plow zone in many areas of the site. It is our experience that soft conditions can extend up to 3 feet in isolated areas where previous clearing has left stump holes which were eventually filled. We have indicated on the boring records where the water softened soils were deeper than about 18 inches.

*Grading:* Prior to initiating fill placement in any areas, the organic surface soils should be stripped. Your plans for stripping the upper 12 inches appear to be adequate. However, after stripping, 6 to 12 inches of water softened soils are likely to remain in most areas, unless substantial site drainage has occurred. Such soft soils should be scarified in-place, dried and recompacted. Scarification and drying can best be accomplished by a disc harrow which turns the soils numerous times during a period of several hours on a warm, sunny day. Turning the soils once will not suffice to air dry the wet clays. Therefore, it is important that site grading be accomplished during a dry season. Some undercutting may be necessary where wet soils extend too deep to scarify and recompact.

Structural fill should be placed in maximum 8-inch lifts and compacted to at least 95 percent of the soil's maximum

dry density as determined by the Standard Proctor compaction test. The upper 12 inches of subgrade beneath pavements should be compacted to at least 98 percent. Soil moisture during placement should be within 3 percent of the optimum moisture content. Comparison of in-place moistures to optimum values of Proctors # 1 and # 2 indicate that drying of the borrow soils will be necessary prior to placement as structural fill. Provisions should be made to scarify and dry sections of the borrow area prior to moving the soils into the fill areas. Effective use of grading equipment will be required to coordinate drying of one area while hauling already dry soils from another area.

### 2. *Conclusions of Law and Discussion*

#### a. *Claim for Additional Compensation*

In Count 2 of the complaint, P & L asserted a claim for extra compensation under the contract for additional grading and fill work necessitated by the high moisture content of the soil, a condition allegedly unknown to P & L at the time it signed the contract and began work. Roadway has moved for summary judgment on this claim on the grounds that (1) the contract imposed the risk of concealed subsurface soil conditions on the contractor; (2) P & L never submitted a timely change order request and is now barred from requesting compensation for extra work; (3) the contract precluded claims for additional compensation for any problems encountered during excavation; and (4) P & L is collaterally estopped from asserting this claim because of a prior judgment entered in favor of P & L in a state court suit brought by Bradford. In response, P & L contends that (1) it can recover on this claim under a theory of breach of implied warranty of the plans and specifications; (2) the excavation and change order clauses are not applicable; and (3) the doctrine of collateral estoppel should not be applied because there is no mutuality or identity of issues.

There is no dispute that P & L encountered excessive moisture in the soil at the project site, and that its performance was delayed and made more difficult as a result. The issue to be determined is whether P & L or Roadway should bear the added costs of this complication. As P & L correctly observes in its brief, the change order provisions of the contract are not applicable because they apply to changes in the scope of work due to a change in the project design, not to difficulties in performance of the specified work as a result of unforeseen adverse conditions. Accordingly, P & L's failure to request a change order in accordance with the contract documents does not bar its claim for additional compensation.

Instead, the question the court must resolve is who bore the risk for unknown obstacles. In the absence of fraud, the party upon whom the contract imposed the risk must absorb any losses resulting from unforeseen conditions. *Anderson v. Golden*, 569 F.Supp. 122 (S.D.Ga.1982); *Robert E. McKee, Inc. v. City of Atlanta*, 414 F.Supp. 957 (N.D.Ga.1976); *see Jahncke Service, Inc. v. Department of Transportation*, 172 Ga.App. 215, 322 S.E.2d 505 (1984).

Some construction contracts, particularly those issued by the federal government, contain what is known as a "changed conditions" or "differing site conditions" clause. Such provisions allow additional compensation for the contractor if it encounters an unexpected or concealed site condition that materially increases the cost of performance of the contract requirements. *See Anderson*, 569 F.Supp. at 143; *Al Johnson Construction Co. v. Missouri Pacific Railway Co.*, 426 F.Supp. 639, 646–47 (E.D.Ark. 1976), *aff'd*, 553 F.2d 103 (8th Cir.1977). The contract between P & L and Roadway did not contain such a clause.

The contract, however, did require the contractor to inspect the site and "inform himself of the conditions" before submitting a bid. Such site inspection clauses impose upon contractors—particularly ex-

perienced ones like P & L—a duty to exercise professional skill in inspecting the site and estimating the cost of the work. *See Anderson,* 569 F.Supp. at 140; *Jahncke,* 172 Ga.App. at 219, 322 S.E.2d at 509. Moreover, the subcontract between P & L and Bradford placed the risk of any unforeseen subsurface soil conditions on Bradford, which suggests that P & L recognized the risk allocation made by the general contract.

■ When the contract contains no changed conditions clause and imposes a site inspection requirement on the contract, the risk of uncertainty of subsurface conditions is placed on the contractor. *Flippin Materials Co. v. U.S.,* 312 F.2d 408 (Ct.Cl. 1963); *Anderson,* 569 F.Supp. at 141–43; *Eastern Tunneling Corp. v. Southgate Sanitation District,* 487 F.Supp. 109 (D.Col.1979); *Jahncke,* 172 Ga.App. at 219, 322 S.E.2d at 509. Accordingly, the court finds that the contract at issue placed upon P & L the risk of extra expenses resulting from unforeseen subsurface soil conditions encountered during performance of the contract work. Thus, P & L is not entitled to recover additional compensation just because work required to be performed under the contract was made more expensive and time-consuming as a consequence of the unexpected soil moisture. *U.S. v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Jefferson Construction Co. v. U.S.,* 392 F.2d 1006, 183 Ct.Cl. 720 (1968); *P & Z Pacific, Inc. v. Panorama Apartments, Inc.,* 372 F.2d 759 (9th Cir.1967).

■ Nonetheless, as P & L has recognized, this result may ·be avoided if the court finds a genuine dispute exists regarding whether Roadway impliedly warranted the plans and specifications, and whether Roadway breached that warranty. *Hollerbach v. U.S.,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *Jefferson,* 392 F.2d at 1011; *Anderson,* 569 F.Supp. at 142. Georgia courts generally have been reluctant to find implied warranties of any kind except in limited circumstances. *See P.B.R. Enterprises, Inc. v. Perren,* 243 Ga. 280, 253 S.E.2d 765 (1979). Other courts

have inferred implied warranties of fitness of plans and specifications, but only to the extent of an identifiable, affirmative, unequivocal statement made by the owner that turned out to be false or materially incomplete or misleading. *See Christie v. U.S.,* 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); *Hollerbach,* 233 U.S. at 169, 34 S.Ct. at 556; *Centex Construction Co. v. James,* 374 F.2d 921 (8th Cir.1967).

In the instant case, the court can find no positive assertion or representation by Roadway regarding soil conditions that allegedly proved to be incorrect. Indeed, the contract contains *no* express representations regarding the presence or absence of excess moisture or poor drainage. The contract states only that a portion of the testing engineer's reports was included. The boring logs incorporated into the specifications show only the type and depth of soil materials found at various points throughout the site. Roadway made no representation that these boring logs provided all information needed by bidders when estimating the cost of excavation and compaction, or even that the logs were correct. Instead, the contract documents directed the contractor to examine the site to ascertain the conditions therein. Furthermore, as Roadway has observed, P & L is not claiming that Roadway *misrepresented* the subsurface soil conditions, but instead contends the true information was *concealed.* The court can find no authority for the proposition that the doctrine of implied warranty should be extended to cover such circumstances.

Given that Roadway made no statements regarding the amount of moisture in the soil, the adequacy of site drainage, or the accuracy of the boring logs, and that no provision in the contract suggests an intent to shift the risk of unexpected subsurface conditions to Roadway, the court finds Roadway is entitled to summary judgment on Count 2 of P & L's complaint. *See Simpson v. U.S.,* 172 U.S. 372, 19 S.Ct. 222, 43 L.Ed. 482 (1899); *Anderson,* 569 F.Supp. at 142–43; *Eastern Tunneling,* 487 F.Supp. at 113–14; *cf. Jahncke,* 172

Ga.App. at 215, 322 S.E.2d at 509 (no breach of contract by owner when contract contained site inspection clause and statement that accuracy of boring logs was not guaranteed).

b. *Claim for Fraudulent Misrepresentation*

P & L asserted an alternative claim for the same damages in Count 3 of its complaint, alleging that Roadway fraudulently misrepresented the soil conditions at the site by failing to disclose material information it received from Law Engineering. Roadway now has moved for summary judgment on this claim on the grounds that (1) P & L did not rely on any statements of Roadway when preparing its bid; (2) Roadway had no duty to provide the information in the Law Engineering reports to P & L; (3) Roadway made no material misrepresentations and had no fraudulent intent; and (4) P & L did not exercise ordinary diligence. In response, P & L contends summary judgment on this claim would be improper because (1) under the circumstances of this case, Roadway owed a duty to disclose the disputed information; (2) the evidence suggests intent to defraud; (3) P & L justifiably relied on the information in the specifications; and (4) P & L exercised ordinary diligence appropriate to the circumstances.

■■■ To recover on a fraud claim under Georgia law, a plaintiff must show misrepresentation, intent, scienter, reliance, and causation. *E.g., Eckerd's Columbia, Inc. v. Moore*, 155 Ga.App. 4, 270 S.E.2d 249 (1980). A claim for fraud may be founded on an allegation of nondisclosure of material information as well as affirmative misrepresentation provided the allegedly defrauding party was obligated to disclose the suppressed information. *O.C.G.A.* § 23–2–53. This duty to disclose may arise either from a confidential relationship or from the "particular circumstances" of the case. *Id.; see Thompson v. Smith Barney, Harris Upham & Co.*, 539 F.Supp. 859 (N.D.Ga.1982), *aff'd*, 709 F.2d 1413 (11th Cir.1983); *Woodall v. Or-*

*kin Extermination Co.*, 175 Ga.App. 83, 332 S.E.2d 173 (1985). In addition, to recover on such a claim, the plaintiff must show an inability to discover the information despite reasonable diligence and also must prove that the concealed information was material. *Anderson*, 569 F.Supp. at 143; *Thompson*, 539 F.Supp. at 864; *Charter Medical Management Co. v. Ware Manor, Inc.*, 159 Ga.App. 378, 283 S.E.2d 330 (1981). What constitutes reasonable diligence under the circumstances is ordinarily a question for the jury. *E.g., U.S. ex rel. MevA Corp. v. Northeast Construction Co.*, 298 F.Supp. 1135 (S.D.Ga.1969).

P & L's claim apparently turns on an allegation of nondisclosure of material information. P & L does not claim that the soil conditions information Roadway provided was inaccurate; rather, P & L contends Roadway failed to disclose the full results of its engineering firm's tests. Accordingly, to avoid summary judgment, P & L must show that a genuine dispute exists either as to the presence of a confidential relationship between it and Roadway or that the particular circumstances of the case created an obligation to disclose the remaining reports.

■■■ P & L has centered its argument on the "particular circumstances" requirement. Generally, a claim for fraud for nondisclosure of material facts may arise in the absence of a fiduciary relationship when the allegedly defrauding party actively conceals a latent defect or intrinsic quality that the other party cannot easily discover, or when one knowingly takes advantage of another who is "laboring under a delusion" regarding the true facts. *Thompson*, 539 F.Supp. at 864; *see Woodall*, 175 Ga.App. at 84, 332 S.E.2d at 174–75; *Georgia Real Estate Commission v. Brown*, 152 Ga.App. 323, 262 S.E.2d 596 (1979). Concealment of a material fact may constitute fraud " 'when from any reason one party has a right to expect full communication of the facts from another.' " *Woodall*, 175 Ga.App. at 84–85, 332 S.E.2d at 175 (quoting *Brinsfield v. Robbins*, 183 Ga. 258, 270, 188 S.E. 7 (1936)).

In *McKee*, 444 F.Supp. at 957, another judge in this district applied this doctrine to circumstances similar to those in the instant case. The plaintiff in *McKee* had submitted the low bid for construction of a pollution control project for the City of Atlanta. The City included its engineer's soil boring logs in the contract documents. After the work began, the plaintiff incurred unexpected expenses because the amount of rock to be excavated was substantially higher than the borings had indicated. *Id.* at 958. Judge Edenfield denied the City's motion for summary judgment on the plaintiff's fraud claim, finding that there was a factual dispute as to whether the plaintiff could have discovered the true subsurface conditions through reasonable investigation. *Id.* at 959–61. He noted that owners who let contracts for competitive bidding usually perform certain job site investigations such as subsurface soil tests and supply the results to the bidders rather than imposing the testing burden on the contractors. *Id.* at 959–60. *See also Pat J. Murphy, Inc. v. Drummond Dolomite, Inc.*, 232 F.Supp. 509 (E.D.Wisc.1964), *aff'd*, 346 F.2d 382 (7th Cir.1965) (owner who had material knowledge of unusual soil conditions committed fraud by failing to disclose the information to the contractor).

■ The court finds the analysis of the *McKee* and *Murphy* courts to be applicable to the instant case. Certainly contractors on large commercial construction projects should be considered capable of discerning the general conditions of a project site through an onsite inspection; however, many subsurface conditions may be detected only through expensive tests performed by qualified engineers or technicians. Roadway's soils engineer testified by affidavit that a soil test could be performed for $75 per sample, but he did not state how many samples would be necessary to determine the subsurface conditions throughout this project site. Both P & L's president and its soils expert testified that, as a matter of common industry practice, the owner on a bid job performs the soils tests and provides all results to the bidders. Like the *McKee* court, this court concludes there is a factual dispute regarding whether the contractor's duty to investigate the site with reasonable diligence included an obligation to undertake whatever actions were necessary to discover the true soil conditions at the project site, and whether Roadway's knowledge of the moisture at the site created an obligation to disclose that information to P & L.

■ Nonetheless, Roadway may be entitled to summary judgment if it can establish that P & L is unable to prove one of the remaining elements of fraud—intent, materiality, and reliance—as a matter of law. Roadway contends reliance cannot be proved because P & L relied upon its subcontractor's price, not Roadway's representations, in formulating its bid. However, the evidence indicates that P & L was concerned enough about the soil conditions to qualify its bid, and it removed the qualification only after receiving assurances that there were no unusual soil conditions.[2] In addition, a factual question remains regarding whether P & L justifiably relied on the specifications as presenting a *complete* picture of the soil conditions at the site.

Similarly, the court finds that factual disputes remain regarding the materiality of the information not disclosed and Roadway's intent to defraud. Intent is virtually always a question for the jury. There is no question Roadway had possession of the contested information before it prepared the bid package, and that it did not provide the test results and reports even after the discussions about P & L's bid qualifications. Furthermore, once P & L became aware of the reports and asked to see them, Roadway waited seven months before releasing them. The record contains sufficient evidence to raise a jury question as to whether Roadway withheld some of

---

2. The contract's merger clause may bar a claim for fraudulent inducement through this conversation. *Goober v. Gulf Oil Corp.*, 574 F.Supp. 237 (S.D.Ga.1983). However, P & L has elected to affirm the contract and sue in tort. Thus, P & L is not precluded from offering this evidence in support of its assertion that it relied on Roadway's statements.

the engineering reports to obtain a lower price for the project construction.

In addition, the withheld information appears to have been material to a contractor's ability to prepare a responsive bid. The reports contained information about the presence of excessive moisture at the site. The reports stated that the standard proctor test should be used rather than the more difficult modified proctor test required by the specifications, and that both the excavations and the fill should be dried before compaction. Such activity undoubtedly would increase the cost of performance of the contract.

Consequently, the court concludes P & L has demonstrated the existence of material factual disputes regarding the elements of its fraud claim. Roadway's motion for summary judgment on this count is DENIED.

*P & L's Motion for Leave to Amend*

On December 27, 1985, four months after Roadway filed its motion for partial summary judgment, P & L moved for leave to amend its complaint to add a claim for breach of the owner's contractual duty to disclose information during the bidding process. P & L contends it should be permitted to assert a claim for damages based on Roadway's failure to disclose information it allegedly was obligated to reveal because of its superior knowledge. P & L asserts that addition of this claim will cause no delay or prejudice because the issues raised have been present throughout the discovery conducted to date.

Roadway opposes this motion on the grounds that the proposed claim does not state a cause of action under Georgia law, and that P & L has raised this claim solely to avoid summary judgment on its fraud claim. Roadway also contends that P & L has delayed in raising this claim unnecessarily and without cause, and that Roadway would be prejudiced by an amendment this late in the lawsuit.

P & L contends its proposed claim for failure to disclose information despite superior knowledge is a contract claim. Plaintiff cites two United States Court of Claims cases in which the court allowed a private

contractor to assert a claim for breach of contract against the federal government for failure to disclose material information regarding site or weather conditions. P & L concedes that this cause of action has not been recognized in Georgia or applied to private owners.

Upon reviewing the proposed Count 5, which is attached as an exhibit to plaintiff's motion, the court is compelled to agree with Roadway that this purported claim is merely an attempt to restate the fraud claim and is not connected in any discernible way with any provision in the contract between the parties. Furthermore, any alleged failure to disclose information material to the bid necessarily must have occurred prior to the execution of the contract. Thus, if the claim for breach is not founded on a contractual provision, under Georgia law it is barred by the merger clause. *See Goober,* 574 F.Supp. at 239.

The court finds that P & L's proposed additional claim does not state a cause of action cognizable in this court. Leave to amend need not be granted when the amendment would be subject to dismissal. *E.g., Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539 (5th Cir.1980); *see Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227 (1962). Consequently, P & L's motion for leave to amend its complaint is DENIED.

*Roadway's Motion for Sanctions*

The last matter for consideration is Roadway's motion for the imposition of sanctions against P & L for failure to comply with the court's order of September 4, 1985, in which the court granted Roadway's prior motion to compel production of documents. In this motion for sanctions, which was filed on October 11, 1985, Roadway contends that P & L failed to produce all the documents required by the September 4 order. Specifically, Roadway asserts that P & L has not produced documentation sufficient to support its claim of extended home office overhead. As a consequence of this noncompliance, Roadway proposes that P & L be precluded from introducing any evidence of damages for extended home office overhead, and that P & L be ordered to pay Roadway's attorneys fees

and expenses incurred in obtaining the requested documents.

In response, P & L asserts that it always has been willing to produce the requested documents, and that all available documents now have been produced. P & L notes that the September 4 order did not set a deadline for completion of the document production. P & L claims the production has been ongoing, but has been complicated because of the large volume of documents required to be produced, P & L's staff's unfamiliarity with the type of evidence needed to prove a claim for extended home office overhead, the absence of P & L's president, and the fact that some of the documents requested by Roadway do not exist. Furthermore, P & L contends, sanctions are inappropriate because Roadway never notified P & L of its complaints regarding the documents produced on September 23, 1985 before filing the motion for sanctions.

The court observed in the September 4 order that the purported discovery dispute raised in Roadway's motion to compel could have been resolved between the parties without the court's intervention. After reviewing the pleadings and affidavits filed in connection with the instant motion for sanctions and considering the statements made during oral argument, the court concludes that its prior observation applies to this motion as well. The parties continue to turn to the court for refereeing of a matter that could—and should—be eliminated by improved and more responsible communication between counsel.

▆ The first discovery dispute came to the court's attention primarily because Roadway chose to file a motion to compel without first serving a formal request for production of documents and then meeting with counsel to resolve any disputes as required by Local Rule 225-4. Roadway filed the sanctions motion only a few weeks after P & L produced hundreds of documents, and again did so without conferring with opposing counsel regarding any deficiencies or missing documents. Roadway seeks to exclude the extended home office overhead element of P & L's alleged

damages altogether. Roadway does not contend that P & L has refused to produce the documents covered by the September 4 order. Instead, Roadway argues that sanctions are appropriate because P & L purportedly took too long to produce the documents and improperly changed its damages calculations and witness during the discovery period.

Under the circumstances, the court finds such a severe sanction is inappropriate, especially when Roadway ultimately received the requested documents, there is no indication of willful failure to produce, and Roadway again made no effort to contact opposing counsel to resolve the dispute before applying to the court for relief. Moreover, Roadway's extensive pleadings on this matter overlook the fact that P & L will not be able to recover any damages for which it cannot present adequate documentation at trial.

The court does not mean to imply that P & L is wholly without fault in this ongoing document production saga. P & L's counsel stated at oral argument that much of the delay stemmed from P & L's unfamiliarity with the calculation of extended home office overhead and management's resulting confusion regarding what documents should be produced. The calculation of such damages has for years been performed according to the formulation set forth in *In re Eichleay*, 60–2 B.C.A. (CCH) ¶ 2688 (1960); *see, e.g., Capital Electric Co. v. U.S.*, 729 F.2d 743 (Fed.Cir.1984). Although, as counsel asserted, P & L may not "be in the habit of suing its clients" and thus did not know how to prove its overhead claim, P & L's counsel undoubtedly was familiar with the proof required.

▆ Nonetheless, the court sees no reason to question P & L's assertions that the documents involved were voluminous, and that the company always has been willing to produce them but the actual production was cumbersome and time-consuming. Furthermore, although the rules of procedure require cooperation and diligence during discovery, the court is unaware of any rule or other authority that precludes a party from recalculating its damages claim

or changing its mind about which witness will testify on that issue, particularly when such actions are taken during discovery rather than on the eve of trial.

Accordingly, the court hereby DENIES Roadway's motion for sanctions. The court further DIRECTS the parties to make a better effort to resolve any future discovery disputes before submitting them to the court.

*Conclusion*

The court has issued rulings on all outstanding motions as follows:

1) Defendant's motion for partial summary judgment is GRANTED as to Count 2 of plaintiff's complaint and DENIED as to Count 3;

2) defendant's motion for sanctions is DENIED;

3) plaintiff's motion for leave to amend is DENIED;

4) both parties' motions to supplement the record are GRANTED;

5) defendant's motion to strike is DENIED; and

6) plaintiff's motion to dismiss defendant's motion to dismiss is DISMISSED AS MOOT.