(99 P.3d 640)
No. 91,057

SADDLEWOOD DOWNS, L.L.C., *Appellant*, v. HOLLAND
CORPORATION, INC., *Appellee*.

—

Opinion filed October 29, 2004.

*Leslie A. Bailey*, of Moore, Hennessy & Freeman, P.C., of Kansas City, Missouri, for the appellant.

*Marty T. Jackson*, of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Overland Park, for the appellee.

Before PIERRON, P.J., MARQUARDT, J., and BUKATY, S.J.

PIERRON, J.: In this construction contract case, Saddlewood Downs, L.L.C., (Saddlewood) appeals the judgment entered in favor of Holland Corporation, Inc. (Holland). Saddlewood argues the trial court erred in finding that Holland was entitled to money for fly ash stabilization work required by the City of Olathe (City) prior to Holland's completion of streets in the Saddlewood Downs subdivision (subdivision). Saddlewood also claims the trial court erred in not finding Holland liable for slander of title for maliciously filing a mechanic's lien. We find the trial court was correct and affirm.

With a few exceptions, the significant facts in this case are undisputed. The central question revolves around Holland's entitlement to money for fly ash stabilization work required by the City. Saddlewood was the owner and developer of the subdivision. Holland's principal business is the construction of asphalt streets as part of new commercial and residential developments.

In March 2000, Holland submitted a bid for the construction of street improvements for the subdivision. Holland was awarded the contract, wherein the parties agreed Holland would "provide all the necessary materials, tools, labor and equipment to construct the [street construction project] in accordance with the approved plans." The contract did not include any line item for fly ash stabilization or mention it directly. The contract also provided that variations of the listed items were not cause for adjustment of the contract, "unless the scope of work [was] changed by written authorization of the Owner." There were two other contracts entered into by Saddlewood and Holland and a third party, Town & Country Manor, L.C., involving street construction on an adjacent development and shared passageways, but those two contracts are not at issue.

There were three written changes made to the contract between Saddlewood and Holland: (1) In May 2000, the parties agreed to

an amendment for the addition of sidewalks; (2) in July 2000, the parties agreed to an amendment for the addition of street lights and gas and electric lines; and (3) in March 27, 2001, the parties consented to Saddlewood's agreement to pay interest on late payments.

In June 2000, after Holland had completed the site grading for the street construction, the City determined that additional stabilization of the subgrade material was necessary to pass inspection and the application of fly ash was required. Fly ash is a mining by-product that is applied to, and mixed with, existing expansive subgrade soil to create a subbase for the asphalt pavement that is stable and nonexpansive. There is no dispute that specifications by the City provide that fly ash could be required in order to provide proper stabilization to the soil under the streets. Holland did not include a line item for fly ash stabilization (or its potential) in its bid, nor did it expressly exclude fly ash from the bid.

Upon being notified that fly ash was required, Holland stopped work and Jeff Shoemaker, Holland's vice-president in charge of the subdivision project, contacted the project engineer, David Scott of Green Engineering, advising of the fly ash requirement. Shoemaker sent Scott a proposal of costs associated with the fly ash work and called a meeting with Scott, Don Virgin (principal member of Saddlewood), Crow (a representative of Town & Country), and Jim Green (Green Engineering).

Shoemaker testified that at the meeting, the parties discussed and negotiated the price for fly ash stabilization and Holland agreed to reduce the price per square yard from $4.95 to $4.45. Scott's testimony confirmed the negotiated lower price, but Virgin testified no agreement was reached as to who would pay for the fly ash stabilization work. Following the meeting, Shoemaker sent Green a revised price quote for the fly ash work per the negotiations at the meeting. Shoemaker testified Virgin contacted him by telephone and instructed him to proceed with the fly ash stabilization work and that Saddlewood would pay for the work at the negotiated price. Virgin disputes that he ever said Saddlewood would pay for the fly ash work, that there was never any agreement reached concerning the fly ash issue, and that he had left the meet-

ing with the understanding that once the project was complete they would "hassle over" the problem if Holland requested additional payment. The fly ash was applied in August 2000.

During the course of construction, Holland delivered several invoices to Saddlewood in support of periodic progress payments. Shoemaker testified that invoices as early as September 2000 included a specific line item under change orders for the fly ash stabilization work. Saddlewood never objected to any of the invoices on the basis that costs for fly ash were included in the project cost. After Saddlewood fell behind in its payments, the parties negotiated the third written amendment previously mentioned concerning Saddlewood's agreement to pay interest.

Upon Saddlewood's refusal to pay the additionally billed sums, on November 29, 2001, Holland filed a mechanic's lien against the Saddlewood property in the amount of $75,312.82. The lien stated that materials and services were last furnished on July 29, 2001, exactly 4 months prior to filing the lien. On December 11, 2001, Holland filed an amended mechanic's lien against the Saddlewood property stating the materials and services were last furnished on October 24, 2001.

Gary Gassen, Holland's treasurer and signatory on both mechanics' liens testified that no work occurred on the project on July 29, 2001, because that date was a Sunday. He said the error occurred as a result of the ending of the pay period on July 29, 2001, and Holland employees had clocked work on the Saddlewood project sometime during the days of the prior week. He said he filed the amended mechanic's lien shortly thereafter because Holland employees still registered time on the project through October 24, 2001.

Despite Holland's mechanic's lien, on December 4, 2001, Saddlewood filed a petition for money had and received alleging overpayment to Holland in the amount of $82,156.50. During the summer of 2002, Saddlewood arranged to sell the subject property. In order to clear title for the sale, Saddlewood paid Holland the amount of the mechanic's lien out of the proceeds of the sale. However, Saddlewood reserved the right to challenge Holland's

mechanic's lien. On December 4, 2002, Saddlewood filed an amended petition adding a claim of slander of title.

The trial court conducted a bench trial in the matter. The court granted judgment in favor of Holland. The court found the fly ash stabilization work was not part of the original contract and that it constituted extra work by Holland for which it was entitled to compensation. The court stated that although there was no written authorization for the fly ash stabilization, Saddlewood's actions or inactions constituted an authorization for the extra work and a waiver of the requirement in the original contract that extra work required written authorization. Holland also reasonably relied on Saddlewood's actions or inactions to its detriment in performing the fly ash stabilization work.

The trial court rejected Saddlewood's claim for slander of title. After not making a specific finding on the technical validity of the mechanic's lien, the trial court stated the weight of the evidence demonstrated that the mechanic's lien was not maliciously filed. Alternatively, the court concluded Saddlewood could not demonstrate any damages as a result of the lien.

Saddlewood appeals.

Saddlewood first argues the trial court erred in finding that Holland was entitled to money for fly ash stabilization work as an addition to the construction contract.

Our standard of review is a mixed one because we must review findings of fact, conclusions of law, and the interpretation of a written contract. The function of an appellate court is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is that which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can be reasonably resolved. *U.S.D. No. 233 v. Kansas Ass'n of American Educators,* 275 Kan. 313, 318, 64 P.3d 372 (2003). An appellate court's review of conclusions of law is unlimited. *Nicholas v. Nicholas,* 277 Kan. 171, 177, 83 P.3d 214 (2004). "The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. Regardless of the con-

struction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. [Citation omitted.]" *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001).

Saddlewood states it was undisputed that the written contract incorporated the plans for the project which in turn incorporated the City specifications requiring fly ash if necessary. Saddlewood argues the record is devoid of any evidence that Holland advised Saddlewood that its contract price excluded fly ash stabilization. Saddlewood recognizes that no specific line item existed in the contract for fly ash but claims it is common knowledge that items exist in a construction contract which are "subsidiary" items that are not stated but are required. We presume this is the same as an implied term to a contract.

Saddlewood maintains that since fly ash stabilization was possibly required under the contract by the City specifications, the cost of the fly ash work was included in the contract price and Holland should reimburse Saddlewood for the overpayment on the contract.

Holland contends the fly ash work was both an extra to the contract and also expressly authorized by Saddlewood. Holland argues the plans submitted by Green Engineering to put the project out for bid did not include specific reference to fly ash and neither Holland nor Green knew, or could have known, that the City would require fly ash stabilization. Holland also argues it was impractical for Holland to determine whether fly ash would be necessary because of all the digging, grading, leveling, and movement of dirt prior to the point when the City would make the actual determination of whether fly ash is needed. Further, Shoemaker testified Holland had performed hundreds of street projects and "never once have we had a street construction contract where fly ash stabilization was a subsidiary to the other work."

Both parties discuss *Green Construction Co. v. Kansas Power & Light Co.*, 717 F. Supp. 738 (D. Kan. 1989), *aff'd* 1 F.3d 1005 (10th Cir. 1993), where the federal district court considered the risk of uncertainty of subsurface conditions. There, the federal district court, applying Kansas law, confronted a similar issue. Green

contracted to build an earthen dam for Kansas Power & Light (KPL) out of clay soil found at the construction site. KPL provided geological data on the site's subsurface conditions but expressly instructed bidders to investigate these conditions independently. Green failed to investigate independently, built the dam, and sued for excessive costs after the dam cracked and required repair. The Tenth Circuit Court of Appeals affirmed the district court's holding that Green could not rely on the implied warranty of specification because the contract expressly allocated to Green the risk that the conditions could be different. See 1 F.3d at 1009. Green's reliance on KPL's specifications alone was unreasonable in light of KPL's specifically requiring Green to conduct an independent investigation of the subsurface conditions. 717 F. Supp. at 741-43.

Holland states that while *Green* is instructive, it is distinguishable because of the strict language involved in the contract between the parties. The contract in *Green* had a specific risk-shifting provision placing the risk of subsurface condition squarely on the contractor. Also, the contract provided the contractor with the right, prior to bidding, to conduct its own investigation into subsurface condition. Saddlewood responds to Holland's distinction of *Green* by citing Shoemaker's testimony concerning the language in the bid instructions that "[n]o boring information has been supplied to these plans. Each bidder must form their own opinion of the character and materials to be encountered from an inspection of the area and from such other investigations the bidder may desire."

In terms of public policy, Saddlewood contends the contractor should bear the burden of unknown subsurface conditions because the contractor is the expert party to the agreement concerning street construction. Saddlewood states Holland knew the potential for fly ash work but did not exclude it in its bid, as it had done by expressly excluding "seeding" from the contract.

Saddlewood alleged that Holland failed to include fly ash in the bid to ensure it would be the low bidder for the job. Scott testified he did not tell the bidders to not include fly ash in their bids. However, Saddlewood does not challenge the trial court's finding that *none* of the bids on the project contained a line item for fly ash stabilization work.

*Pinkerton and Laws Co., Inc. v. Roadway Exp. Inc.*, 650 F. Supp. 1138 (N.D. Ga. 1986), was cited in *Green.* In *Pinkerton,* the contract specifically noted the obligation of the contractor to "examine the site, inform himself of the conditions and make his own estimates of the facilities and difficulties attending the execution of the work." 650 F. Supp. at 1142. Additionally the applicable subcontract contained a specific provision stating "all subsurface soil conditions are the responsibility of the subcontract or as it relates to his work described above." 650 F. Supp. at 1144. Apparently some testing had been done under another contract. The court noted: "When the contract contains no changed conditions clause and imposes a site inspection requirement on the contract, the risk of uncertainty of subsurface conditions is place on the contractor. [Citations omitted.]" 650 F. Supp. at 1146. This obligation was recognized when the subcontract specifically required the subcontractor to be aware of the subsurface soil conditions in discharging its parts of the contract. Although *Pinkerton* would seem to place a like responsibility on Holland, we note the distinguishing fact in the instant case.

We agree with the trial court's conclusion that fly ash stabilization work was not part of the original contract and Holland was entitled to additional payment for the work. There are three critical and distinguishing facts to support this determination: (1) the absence of a request to include potential fly ash stabilization work in the bid package; (2) the contract does not contain a line item where the parties agreed fly ash would be included; and (3) the negotiations on the costs of the fly ash work, indicating it was viewed by the parties as an additional item. Under the facts of this case, the fly ash stabilization work is not properly considered a "subsidiary" item to the contract.

The focus of this issue is whether Holland or Saddlewood bore the risk and the cost of the City's decision to require fly ash stabilization. The plans put out for bid by Green included a statement that the project was governed by the City of Olathe Technical Specifications. The contract executed by the parties stated that Holland would construct the streets "in accordance with the approved plans." The dilemma, or unknown, in this case is whether the City

would in fact require fly ash. The City specifications do not require fly ash in all cases. Saddlewood argues Holland has the duty and expertise to test and decide whether fly ash would be needed and is ultimately responsible for the cost. We agree with the trial court that "it would have been impractical for Holland to have done the work necessary to determine whether flyash stabilization would be required by the City prior to initiating work on the project." Further, the evidence presented indicates it was unclear whether the City would require fly ash until after the work was underway and the City performed its inspection. All parties proceeded to act in a way consistent with this view.

Next, Saddlewood argues that even if the fly ash was extra work, the district court erred in holding that Saddlewood authorized the extra work either expressly or impliedly or by waiving the requirement for written authorization for modifications to the contract. Saddlewood argues there must be a pattern of disregarding contractual requirements in order to avoid the requirement for written authorization. Saddlewood states there were three other written authorizations to the contract demonstrating a pattern of written authorizations for changes to the contract, not a pattern of disregarding contract requirements.

The question of whether a written contract may be modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether that contract be in writing or parol, has long since been set to rest. Nearly a century ago in *Hill v. Maxwell*, 71 Kan. 72, 75, 79 Pac. 1088 (1905), the court stated:

" 'It is well settled that the terms of a written contract cannot be varied by any previously executed contract, written or parol, nor by any contemporaneous parol contract. It is equally settled, that the terms of a written contract may be varied, modified, waived, annulled, or wholly set aside, by any subsequently executed contract, whether such subsequently executed contract be in writing or in parol.' (*Todd v. Allen*, 18 Kan. 543, 544. See, also, 29 A. & E. Encycl. of L. 829.)"

The terms of a written contract can be varied, modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether such subsequently executed contract be in writing or parol. *Coonrod & Walz Const. Co., Inc. v. Motel Enterprises,*

*Inc.*, 217 Kan. 63, 73, 535 P.2d 971 (1975). This is generally the case in building and construction contracts as well:

"A provision in a private building or construction contract that alterations or extras must be ordered in writing can be avoided by the parties to the contract when their words, acts, or conduct amount to a waiver, modification, rescission, abrogation, or abandonment of the provision, or when the owner (or the general contractor in the case of a subcontractor) by his or her acts or conduct is estopped from reliance on it." 13 Am. Jur. 2d, Building and Construction Contracts § 25, p. 28.

Whether a term of a written contract has been modified or waived by a subsequent agreement is a question of fact for the trial court. *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 330, 582 P.2d 1111 (1978); see generally 17A Am. Jur. 2d, Building and Contraction Contracts § 510, p. 524 ("Whether a contract has been modified by the parties thereto is ordinarily a question of fact for the trier of fact, as where the evidence is conflicting or the terms of the agreement are equivocal or uncertain."). Again, we examine the lower court's decision to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. See *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. at 318.

There is substantial competent evidence to support the trial court's finding that Saddlewood either expressly or impliedly authorized Holland to complete the fly ash stabilization work and agreed to compensate Holland at a negotiated price. We recognize, as directed by Saddlewood, that Virgin testified that no such agreement was ever entered and that he gave no authorization for fly ash work. The flipside is Shoemaker's testimony that Virgin called him and specifically authorized the fly ash work. Holland states the trial court heard the testimony of both witnesses and found Shoemaker to be the most credible. We are bound by that finding which is supported by substantial competent evidence.

The evidence at trial indicates that Holland immediately brought the fly ash situation to the attention of all parties involved. A meeting occurred where the cost of the fly ash work was specifically addressed and a price was negotiated. We note if Saddlewood con-

sidered the fly ash work to already be encompassed for in the contract, it would not have been necessary to further negotiate for the cost of the work. Holland presented correspondence reflecting the lower price negotiated for the fly ash work.

Saddlewood's main argument is that it never agreed which party would be responsible to cover the cost of the fly ash work. Even giving Saddlewood the benefit of the doubt, it was still Saddlewood's negotiations and then inaction or silence concerning payment that at least partially caused its liability for the extra work. The trial court concluded:

"[I]t was, or should have been, clear to Mr. Virgin that Holland considered the flyash stabilization extra work for which it expected to be paid. Testimony was presented that one of the topics of discussion at the meeting was a negotiation of the price for the flyash stabilization. This is further supported by letter from Holland to Green with an initial price estimate for the flyash stabilization, and a subsequent letter which appears to reflect a lower price for the flyash stabilization negotiated at the above-referenced meeting."

We are not convinced by Saddlewood's claim that a pattern of disregarding written authorization *must* be evident for an oral modification to be binding. See *Coonrod & Walz Construction Co. v. Motel Enterprises, Inc.*, 217 Kan. 63, 535 P.2d 971 (1975); *Owens v. City of Bartlett*, 215 Kan. 840, 528 P.2d 1235 (1974). A pattern of disregarding written authorization is just another factor in examining the entire contractual situation. The trial court's conclusion that Saddlewood expressly authorized the fly ash stabilization work and accepted the work at the amount negotiated with Holland is sufficient evidence of an agreed modification of the contract despite the lack of a written agreement. The isolated nature of the oral fly ash authorization will not cause its demise when considered in light of all Saddlewood's actions or inactions in the face of negotiations and meetings regarding the fly ash work.

Saddlewood also challenges the amount due Holland because there was no evidence regarding the quantities of material and labor provided to the project for the fly ash stabilization or as to the reasonable charges by Holland for the fly ash work. We disagree with Saddlewood's conclusion that the trial court had no basis in evidence for the finding that Holland was owed money. There

is substantial competent evidence in the record that the parties conducted a meeting where they negotiated the cost of performing the fly ash work and that they agreed on a specific reduced price. This agreement was the contracted price for performance of the fly ash work. Saddlewood's arguments concerning the lack of evidence for materials and labor and reasonableness of the charges are not relevant where they contracted for performance of the work at a specified cost.

Next, Saddlewood argues the trial court erred in finding that Holland's lien was not maliciously filed.

"Malice is defined as a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse. Existence of malice is ordinarily a question of fact, unless the evidence is undisputed." *Werdann v. Mel Hambelton Ford, Inc.*, 32 Kan. App. 2d 118, Syl. ¶ 14, 79 P.3d 1081 (2003). Our review is to determine whether the trial court's findings of fact are supported by substantial competent evidence. Substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. See *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. at 318.

Saddlewood states that Holland intended to harm Saddlewood by filing the mechanic's lien because Holland knew it would encumber the property and Saddlewood would pay the lien in order to sell the property. Saddlewood argues the lien was false and invalid under the statute as recognized by the trial court. Saddlewood cites Gassen's testimony that he signed and verified both lien documents but that he had no personal knowledge of the project, when the last work was performed, or how much of the lien was for materials provided, rental charges, overhead, profit, and fly ash work. Saddlewood argues Holland filed its lien with a malicious state of mind.

On the other hand, Holland argues there is substantial evidence to support the trial court's finding that Holland did not act with malice when it filed the mechanic's lien. Holland cites several pieces of evidence: (1) testimony indicating Holland worked on the property through the last date of work indicated on the amended lien statement; (2) the work performed on the property through

October 24, 2001, was lienable work because it was necessary for satisfactory completion of the job prior to the City approval; (3) the lien statement had all the necessary attachments for a reasonable itemization of the amount of the claim; (4) Gassen was the proper officer to verify the lien because he was Holland's treasurer and had access to the necessary business records, including time sheets, diary reports, and invoices; and (5) there is no evidence the amended lien statement contained intentionally false information.

The trial court essentially recognized there might be some problems with the "technical validity" of Holland's mechanic's lien but that the insufficiencies did not amount to malicious intentions. The requirements for a mechanic's lien must be strictly met. It is only after the lien has attached that the mechanic's lien provisions are liberally construed. *J. Walters Constr. Co. v. Greystone South Partnership,* 15 Kan. App. 2d 689, 691, 817 P.2d 201 (1991). Mechanics' liens are statutory and can only be acquired in the manner prescribed in the statute. Those claiming a mechanic's lien have the burden of bringing themselves clearly within the provisions of the statute. *Security Benefit Life Ins. Corp. v. Fleming Companies, Inc.,* 21 Kan. App. 2d 833, 838, 908 P.2d 1315 (1995), *rev. denied* 259 Kan. 928 (1996).

Saddlewood argues the trial court erred in denying its claim for slander of title because the lien included nonlienable items, contained a false date of final work on the project, was falsely verified by Gassen, and was filed without probable cause and not in good faith. Saddlewood argues the insufficiencies in the lien and the knowledge that the lien would encumber the property were sufficient to support its claim of malice and the resulting consequence of slander of title.

Holland states it was certainly aware that its mechanic's lien would encumber the property. That, of course, is why one files a mechanic's lien. Holland states that filing a lien is not tantamount to acting with malice simply because the lien will encumber the property.

Most of Saddlewood's arguments concerning the legality of the mechanic's lien involve a determination of whether the work performed through the date listed on the amended mechanic's lien

could be considered lienable work or was gratuitous work performed after the contract was fully performed. See *Stickney v. Murdock Steel & Engineering, Inc.*, 212 Kan.653, 655, 512 P.2d 339 (1973) (lienable work is such work necessary to be performed under the terms of the original contract to complete the job). The parties each raise legitimate arguments supporting a determination in their favor. Saddlewood might have a good argument that it was an invalid lien. But we find, as the district court did, that Holland's actions in filing the lien were not malicious as intending harm without reasonable justification. They were permissible for attempting collection of money Holland felt was due and owing. There were also substantial facts and arguments tending to support the lien's validity.

Next, Saddlewood argues the trial court erred in denying its claim for slander of title against Holland. "Slander of title is defined as 'a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, causing him injury.' 50 Am. Jur. 2d, Libel & Slander § 539, p. 1058." *Safety Federal Savings & Loan Ass'n v. Thurston*, 8 Kan. App. 2d 10, 13, 648 P.2d 267 (1982).

The trial court found that Saddlewood's claim for slander of title could not survive because of the lack of malice by Holland and insufficient damages presented by Saddlewood. When a district court makes a negative factual finding, it signifies that the party having the burden of proof did not meet that burden. Such a finding will not be disturbed by an appellate court absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice. *Mynatt v. Collis*, 274 Kan. 850, 872, 57 P.3d 513 (2002).

Saddlewood's claim for slander of title begins and ends with the trial court's finding that Saddlewood did not demonstrate that Holland acted with malice in filing the mechanic's lien. In the absence of malice, Saddlewood has not demonstrated an essential element of its claim and the trial court did not err in refusing Saddlewood's claim for slander of title. We find the trial court did not disregard undisputed evidence in finding that Saddlewood failed to establish all the elements for a claim of slander of title.

Affirmed.